2002 ME 157

**Vernon HAINES**

v.

**GREAT NORTHERN PAPER,
INC. et al.**[1]

Supreme Judicial Court of Maine.

Argued: Sept. 5, 2002.
Decided: Oct. 11, 2002.

J. Hilary Billings, Esq. (orally), Billings & Silverstein, Bangor, for plaintiff.

Ann M. St. Peter–Griffith, Esq. (orally), Peter W. Culley, Esq., Pierce Atwood, Portland, for Great Northern Paper, Inc. and Rich Timber Holdings, LLC.

Glen L. Porter, Esq. (orally), Eaton Peabody, Bangor, for Great Northwoods, LLC, McDonald Investment Co., Inc., et al.

---

1. Great Northwoods, LLC, McDonald Investment Co., Inc., and Rich Timber Holdings, LLC are also listed appellees.

Panel: SAUFLEY, C.J., and CLIFFORD, RUDMAN, DANA, ALEXANDER, CALKINS, and LEVY, JJ.

ALEXANDER, J.

[¶1] Vernon Haines, for himself and on behalf of the Millinocket Fin & Feather Club, appeals from the judgment of the Superior Court (Penobscot County, *Hjelm, J.*) denying Haines's motion for summary judgment, granting the defendants' motions for summary judgment on Haines's complaint, and entering summary judgment in favor of Rich Timber Holdings and Great Northern Paper (GNP) on their counterclaims. Haines contends the Superior Court erred in: (1) granting Rich Timber Holdings's and GNP's motion to strike Haines's statement of material facts; (2) denying Haines's motion to amend his defective statement of material facts; and (3) entering summary judgment in favor of the defendants and the parties-in-interest. We affirm the judgments.

## I. CASE HISTORY

[¶2] In 1993, GNP and the Millinocket Fin & Feather Club signed an agreement by which the club agreed to withdraw opposition to the issuance of certain licenses by the Federal Energy Regulatory Commission (FERC). In return for their withdrawal of opposition, GNP agreed that: it will eliminate current, and not impose future, access fees on non-commercial, day use by Maine residents of its forest lands within the company's gate system in the State of Maine, provided however, that the F & F Club recognizes that Great Northern is entitled to have recreational users of its land share in the cost of maintaining that land for such use; and, provided further, that Great Northern has the right to limit the total number of users of its land, but not to less than 1993 levels, if in its sole judgment, Great Northern determines that increased user levels have adversely impacted or pose a threat of adversely impacting safety, recreational use, ecological resources, or Great Northern's ability to properly manage its forest lands for timber harvesting purposes. This agreement took effect upon the issuance of the FERC licenses in 1996 for a term to coincide with the thirty-year term of the licenses. Pursuant to the 1993 agreement, GNP then ceased charging day use fees for Maine residents' access to GNP lands within its gate system.

[¶3] In October 1998, GNP and its parent corporation, Bowater, Inc. agreed to sell to McDonald Investment Co. (McDonald) approximately 671,000 acres of GNP's Maine timberland. A significant portion of the GNP lands that had been subject to the agreement with the Fin & Feather Club was included in this sale. Exempt from this sale were lands "used [for] and necessary" to the operation of thirteen storage dams, six hydroelectric generating stations, one pumping station and associate transmission lines, towers, conduits, etc., plus other land "within F.E.R.C. project boundaries, including all recreational facilities and shoreline buffers and reservations of utility and transportation easements with respect to the so-called 'Golden Road.'"

[¶4] In preparation for closing of the transaction, in late March 1999, GNP created two limited liability corporations, Rich Timber Holdings, LLC and Great Northwoods, LLC. The timberlands that GNP had agreed to sell were transferred to these two limited liability corporations. GNP's shareholder interests in Great Northwoods, LLC and Rich Timber Holdings, LLC were then transferred to McDonald and its subsidiary McDonald Northwoods, LLC to complete the agreed

purchase of timberland by McDonald. All of these corporate creations and transactions occurred within approximately a three week period. After completion of the sale, but by prearrangement with McDonald, management responsibility for the acquired lands was transferred to Wagner Forest Management, LTD. Wagner then agreed with Great Northwoods and Rich, both owned by McDonald, to impose day use access fees on the lands owned by Rich and Great Northwoods within the gate system controlled by Wagner. No day use or access fees have been charged to Maine residents to pass through any gates that continue to be controlled by GNP or to access land that GNP continued to own after this transaction.

[¶ 5] On June 30, 1999, Vernon Haines, a member of the Millinocket Fin & Feather Club, presented himself at the "Caribou checkpoint" maintained by Wagner stating that he was seeking access to lands covered by the agreement without payment of the requisite day use fee. Haines was denied access to the lands and was arrested and charged with theft of services and criminal trespass.

[¶ 6] Haines then filed a complaint for himself and on behalf of the Club against GNP, Great Northwoods, Rich Timber Holdings, McDonald, Wagner, and North Maine Woods, Inc., (NMWI), the entity that manages the gate and fee collection system for various timber holding companies. The claims against Wagner and NMWI were later dismissed. The complaint asserted breach of the 1993 agreement by imposition of access fees. GNP

and Rich Timber Holdings counterclaimed for a declaratory judgment that the 1993 agreement did not bind any party other than GNP and that GNP and Rich were not liable for access fees imposed after the 1999 sale to McDonald.

[¶ 7] In June 2001, Haines filed a motion for summary judgment. Haines's motion was supported by a statement of material facts. M.R. Civ. P. 56(h). However, Haines's statement of material facts failed to include the required record citations to support its statements, M.R. Civ. P. 56(h)(1),[2] although such record citations had been required by the rules governing summary judgment practice since 1990. See M.R. Civ. P. 7(d), adopted January 23, 1990 and effective July 1, 1990.[3]

[¶ 8] The defendants then filed a motion for summary judgment and an opposition to Haines's motion for summary judgment, seeking to strike Haines's motion for its failure to provide the requisite record citations. Haines filed a motion to amend his defective statement of material facts and an opposition to the defendants' motions for summary judgment. Later, Haines filed the required opposing statement of material facts, twenty-three days after expiration of the time permitted for filing that opposition. M.R. Civ. P. 7(c)(2).

[¶ 9] After a hearing, the court denied Haines's motion to amend the statement of material facts to include the proper record citations, and the court dismissed and denied Haines's motion for summary judgment because it was improperly supported. The court then granted the defendants' motion for summary judgment

---

**2.** M.R. Civ. P. 56(h)(1) requires that:

(1) Supporting Statement of Material Facts. A motion for summary judgment shall be supported by a separate, short, and concise statement of material facts, set forth in numbered paragraphs, as to which the moving party contends there is no genu-

ine issue of material fact to be tried. Each fact asserted in the statement shall be supported by a record citation as required by paragraph (4) of this rule.

**3.** *See* Maine Reporter, 563–575 A.2d, LXIX–LXXIII, (1990).

on the complaint and the counterclaim. In its judgment, the court stated that the 1993 agreement did not bind any parties to the actions other than GNP and did not "have binding effect on lands not owned by Great Northern." It also determined that the 1993 agreement "does not require Great Northern to impose the obligations under the agreement on any purchaser from Great Northern and is not binding on any entity that has purchased land from Great Northern." Haines and the Fin & Feather Club filed this appeal.

## II. DISCUSSION

[¶ 10] The procedural deficiencies in Haines's original statement of material facts and the delay in Haines's opposing statement of material facts were subject to considerable attention in the trial court. The court did not abuse its discretion by denying Haines's motion to amend. Furthermore, it appears that even if the court had granted Haines's motion, the end result would be the same. There is one basic legal question that must be decided—whether the obligations that GNP undertook in its 1993 agreement with the Fin & Feather Club bind subsequent purchasers of GNP's lands, when there appears to be no dispute that the purchase was an arms length transaction, for fair market value, that transferred control of GNP's lands to a corporation entirely independent of GNP.

[¶ 11] The facts regarding this issue are established without dispute in materials properly before the court. The 1993 agreement is a matter of record. It applies to GNP's "forest lands" within GNP's "gate system," while anticipating that recreational users may be asked to "share in the cost of maintaining [GNP's] land for such use." GNP does not charge day use access fees for lands subject to the agreement that GNP has retained. The land

sale was accomplished by the creation of two limited liability corporations, by GNP transfers of the lands to those limited liability corporations and then transfer of all of the shareholder interests in those two corporations to McDonald. The two corporations were created and transferred solely to accomplish the sale. There is nothing in the record to suggest that they served any other function independent of the sales transaction. Thus, there is no issue of GNP transferring control of the lands to a wholly owned subsidiary that it continues to control.

[¶ 12] The 1993 agreement did not purport to create any easement, fee interest or other obligation running with the land that GNP owned at the time. The agreement also did not purport to limit GNP's rights to alienate the land, or portions of the land, to other independent entities. On its face, the agreement is limited to lands that GNP owns and gate systems that GNP operates. Haines concedes that the 1993 agreement did not expressly obligate GNP to condition future conveyances to others upon compliance with the obligations of the agreement. Instead, Haines argues that we should construe the agreement to create an implicit limitation upon GNP's capacity to alienate any of its land, unless it imposes upon the land and upon the subsequent buyer a condition that no day use access fees be imposed upon Maine residents for the original term of the agreement.

[¶ 13] Absent extraordinary circumstances, not present here, we will not lightly infer into private agreements restraints upon alienation of land or upon uses of land that bind subsequent independent purchasers of the land. *See Low v. Spellman*, 629 A.2d 57, 59 (Me.1993); *see also* RESTATEMENT (THIRD) OF PROPERTY § 2.11 cmt. c (2000). The 1993 agreement applies, by its terms, only to

GNP. The agreement does not include terminology commonly used to bind transferees, successors or assignees or lands that they may acquire. Without such terminology in the agreement, we will not construe it to restrain alienation of the land or impose the conditions of the agreement upon subsequent purchasers of the land.

[¶ 14] Citing *Top of the Track Assocs. v. Lewiston Raceways, Inc.*, 654 A.2d 1293 (Me.1995), Haines argues that we should imply into this agreement a covenant limiting alienation of lands and barring transferees of lands from imposing fees inconsistent with the agreement. However, *Top of the Track* does not assist Haines here. The implied covenant that we suggested might be found in the agreement between Top of the Track (a race track restaurant) and Lewiston Raceways (the race track) involved a commitment to continue to operate the race track, upon which the restaurant was wholly dependent. *Id.* at 1294. In that circumstance, we remanded for findings of fact as to whether such an implied covenant existed. *Id.* at 1297. In *Top of the Track*, there was no need to imply a restraint upon alienation. We only considered inferring a covenant regarding continued operation on the very unique facts of that case, involving one business whose success was wholly dependent upon the operation of the other and where the dependent business had significantly changed position and been encouraged to spend funds in responsible anticipation of continued operation of the race track. *Id.* at 1294–96. No such business relationship or condition of dependence exists here.

 [¶ 15] Haines urges, in the alternative, that we should invoke a duty of good faith and fair dealing to impose a covenant not to sell the land or to sell the land subject to an obligation to comply with the fees agreement. This claim also fails. We have declined to impose a duty of good faith and fair dealing except in circumstances governed by specific provisions of the Uniform Commercial Code. *See First NH Banks Granite State v. Scarborough*, 615 A.2d 248, 250–51 (Me.1992). The 1993 agreement is not governed by the Uniform Commercial Code.

[¶ 16] Accordingly, the 1993 agreement does not bind McDonald or other entities under its control as subsequent independent purchasers of the Great Northern lands, and the agreement is limited in application to lands owned and gate systems operated by GNP.

The entry is:

Judgments affirmed.