# United States Court of Appeals

## For the First Circuit

No. 02-2335

JOSEPH G. WORTLEY; BARBARA J. WORTLEY,

Plaintiffs, Appellants,

v.

PETER M. CAMPLIN,

Defendant, Appellee.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. D. Brock Hornby, U.S. District Judge]

Before

Lynch, Circuit Judge, and
Campbell and Porfilio,* Senior Circuit Judges.

David J. Perkins with whom Patrick J. Mellor and Perkins
Olson, P.A. were on brief for appellants.

Paul F. Macri with whom William D. Robitzek and Berman &
Simmons, P.A. were on brief for appellee.

June 24, 2003

---

* Of the Tenth Circuit, sitting by designation.

**LYNCH**, **Circuit Judge**.  Peter Camplin, a Maine businessman, owned and operated the Sea Dog Brewing Company, which ran into financial trouble.  In the spring of 2000 he sold the company to Joseph and Barbara Wortley, who set up a trust to hold the stock.  Claims and litigation brought by each side ensued.  Eventually a federal court jury found that Joseph Wortley had violated the federal securities laws, Section 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78j(b) (2000), and Rule 10b-5, 17 C.F.R. § 240.10b-5 (2002), and awarded Camplin $265,000 plus interest.  At trial the judge dismissed Wortley's claim that Camplin had violated warranties under Maine's version of the Uniform Commercial Code ("U.C.C.") on the ground that the evidence demonstrated the Wortleys had waived the claim through a document they executed.

The Wortleys appeal, making three arguments.  Both appeal the dismissal of the U.C.C. warranty claim; Joseph Wortley also argues that the evidence was insufficient as a matter of law to sustain the jury verdict against him and that the damages award was excessive and contrary to law.  We affirm.

I.

Camplin founded the Sea Dog Brewing Co. in 1992.  He owned all the stock (one hundred shares) in Sea Dog, either through a proxy (his brother) or in his own name. He operated the business together with his two sons: Brett, who ran the kitchens, and Peter,

Jr., who managed the business end. Sea Dog opened its first location, a tavern serving food and its own micro-brewed beers, in Camden, Maine in 1992. In 1995, Sea Dog opened a second location (in Bangor, Maine) and began bottling and distributing beer on a larger scale for sale outside the chain's restaurants and bars. Sea Dog's bottling and distribution operations produced substantial losses starting in 1996.

On February 28, 1997, Sea Dog closed on a $1.8 million loan from Camden National Bank.[1] Camplin personally guaranteed the loan.[2] As collateral, Camplin pledged his one hundred shares of Sea Dog stock; his personal residence in Lincolnville, Maine; and the stock and income from a trust holding a partial ownership interest in a building in Freeport, Maine. Camplin's Sea Dog stock remained subject to this pledge through spring 2000, when he sold the stock to Wortley.

Sea Dog lost over $900,000 from 1996 to 1998. In 1999, Camden National Bank asked Camplin to find another bank with which

---

[1] The original loan commitment letter, signed on December 17, 1996, provided that Camplin's wife, Cynthia, would personally guarantee the loan, but did not mention a pledge of Sea Dog stock as collateral. The closing documents, however, do not include a personal guarantee by Cynthia and do include the pledge of Sea Dog stock.

[2] There was also a U.S. Department of Agriculture guarantee covering approximately 70 percent of the $1.8 million loan. This guarantee apparently was not transferrable if the loan was refinanced with a different bank.

to do business.  Camplin approached several banks but was unable to refinance.

Sea Dog's balance sheet shows that it was insolvent in 1999.  Camplin's accountant indicated on Sea Dog's 1999 financial statement that the company might be unable to continue as a going concern.  Sea Dog's near-term financial problems grew increasingly severe.  By spring 2000, it owed over $500,000 to trade creditors, and the landlord at one of its locations had initiated eviction proceedings.  Sea Dog nevertheless retained substantial assets, including an option on a piece of real estate in Bangor valued at over one million dollars.

Camplin decided to sell Sea Dog.  In January 2000, he began negotiations to sell Sea Dog to Fred Forsley, a friend and business associate who was the president of Shipyard Brewing Co.[3] Camplin and Forsley entered into a letter of intent for a secured creditor sale of Sea Dog; in this letter, Sea Dog acknowledged that it was in technical default of its obligations to Camden National Bank, and agreed not to block the Bank from foreclosing on Camplin's Sea Dog stock and then re-selling the stock to Forsley. The letter of intent provides that Forsley would use "[a]ll efforts . . . to maintain employees" after a sale.  The deal fell apart in February or March 2000, apparently because Forsley would not

---

[3] After Sea Dog decided to abandon the brewing business in the late 1990s, Shipyard Brewing Co. licensed the right to brew Sea Dog beers.

indemnify Camplin for his personal guarantee of the bank loan. Camplin then began aggressively looking for another prospective buyer.

In March 2000, Scott Johnson, Camplin's brother-in-law, introduced Camplin to Wortley, an entrepreneur living in Florida who had been Johnson's college roommate. Camplin and Wortley met on March 21 and 22, 2000, in a restaurant in Florida to discuss Wortley's possible acquisition of Sea Dog. Camplin says that during these meetings the two men agreed that Camplin would sell Sea Dog to Wortley for $100 plus the following consideration: (1) Wortley would indemnify Camplin from any personal liability on the guarantee of the $1.8 million bank loan as well as smaller obligations to other Sea Dog creditors; (2) Wortley would pay Camplin the sum of $108,000 as reimbursement for personal funds Camplin had recently invested in Sea Dog, and Camplin would continue to receive his salary and benefits until this sum was paid; (3) Wortley would retain Camplin's two sons, Peter and Brett, in Sea Dog's senior management; and (4) the legal documents memorializing the transaction would incorporate these promises. Camplin's son, Peter, Jr., testified that Wortley made the first three promises again at a meeting on April 2, 2000.

Wortley's recollection of the meetings on March 21 and 22 and April 2 was very different. He acknowledged that Camplin raised the issues of the $1.8 million personal guarantee, the

-5-

$108,000 investment, and his sons' employment, but he denied agreeing to Camplin's requests. As to the personal guarantee, Wortley testified that he told Camplin he would "stand between him and Camden National Bank" by foregoing any offer by the Bank to discount the debt as part of refinancing (which might require Camplin to pay the difference between the discounted amount and the full amount.) Wortley also acknowledged that he told Camplin there was a possibility "to take the bank out of the picture [altogether] by the end of the summer." Wortley testified that he refused to reimburse Camplin the sum of $108,000, but gave him the opportunity to earn at least some of the money back by consulting for Sea Dog. Wortley testified that he agreed merely to continue employing Camplin's sons, not to have them head Sea Dog. Wortley testified that the "driving force" behind Camplin's willingness to sell Sea Dog for the nominal consideration of $100 was his recognition that the business needed an immediate injection of cash in order to survive.

Camplin and Wortley met on April 7, 2000 to sign a stock purchase agreement (SPA). The SPA, which was drafted by Wortley's attorney, provides that Wortley purchase Camplin's Sea Dog stock for $100. It does not mention the promises Wortley allegedly gave as consideration at the March 2000 meetings.[4] Clause 2(b) does

_____

[4] The paragraph entitled "Representations and Warranties of Seller" says in part: "[Camplin] is the owner of the stock, free of all liens, pledges, encumbrances, security interests and adverse

-6-

provide that Wortley's obligation to purchase (but not Camplin's obligation to sell) is contingent upon the signing of "a more comprehensive stock purchase agreement containing comprehensive representations, warranties and covenants of Seller, satisfactory to Purchaser and his counsel, with respect to the Stock and the Company's business, financial condition, results of operations and prospects." The SPA contains an integration clause.

Camplin testified that before signing the SPA he observed to Wortley that the agreement omitted the promises that were his main consideration for the Sea Dog stock. Wortley, Camplin testified, responded that the parties would sign a subsequent, comprehensive agreement containing Wortley's promises. According to a letter sent by Camplin on November 6, 2000, Wortley referred Camplin to clause 2(b) of the SPA, assuring him that the omitted promises would be part of the agreement referenced therein. On this basis, Camplin testified, he signed the SPA. He says he put aside his concerns about the SPA's omissions and ambiguities partly because Sea Dog's precarious financial situation created strong time pressure.[5] Camplin, a self-described sophisticated

claims." As Camplin acknowledged on the stand, this representation was untrue.

[5] Both sides apparently regarded the deal as highly time-sensitive. Wortley's attorney purportedly did such limited due diligence that he did not discover that the stock had already been pledged to Camden National Bank.

businessman who had several lawyers, was not represented by an attorney in the sale of Sea Dog to Wortley.

In mid-April, Wortley transferred $30,000 to a trust maintained by Camplin's attorney to be used to purchase merchandise for Sea Dog. Camplin did not receive any of this money. Apart from Camplin's salary and the initial $100 payment, Wortley made no payments to Camplin before Sea Dog's bankruptcy filing in November 2000.

On May 1, 2000, Wortley assigned his rights under the SPA to his wife for the purpose of placing the Sea Dog stock in trust. That day, Wortley's attorney faxed Camplin a letter, signed by both Mr. and Mrs. Wortley; an Assignment and Transfer of Rights; and a Stock Power. The letter notified Camplin of the assignment, requested that he sign and return the attached documents, and waived those "Conditions to Purchaser's Obligations" from the SPA that had not yet been fulfilled. Camplin then called Wortley's attorney to ask whether a more comprehensive agreement was forthcoming. Camplin testified that Wortley's attorney answered affirmatively. Wortley's attorney denied this and testified that he told Camplin that Camplin needed to speak directly to Wortley. Camplin executed the Assignment and Stock Power documents on May 2, 2000, transferring his Sea Dog stock to Mrs. Wortley. Later that day, Mrs. Wortley transferred the stock to the Sea Dog Trust.

Wortley initially kept Camplin and his sons on the payroll, but failed to fully meet his purported obligations to any of the family members. Sea Dog paid Camplin's salary and health benefits during much but not all of the summer and fall of 2000. Meanwhile, Wortley and Scott Johnson, whom Wortley appointed President of Sea Dog, effectively demoted both of Camplin's sons. Brett left Sea Dog in the summer of 2000, shortly after Wortley took over, and went to work for a food supplier on its Sea Dog and other accounts. Peter, Jr. left in June 2001, because of an apparent reprisal against his family (in response to his father's lawsuit), and got a job with a mortgage company. Both brothers had better pay and benefits at their new jobs than at Sea Dog.

Wortley did take several steps to remedy Sea Dog's financial problems and to protect Camplin against personal liability. Wortley notified Sea Dog's creditors by letter dated May 2, 2000 that Camplin had sold the company's stock to the Sea Dog Trust. Later that month, after Camden National Bank notified Camplin that the stock transfer constituted a default under the terms of the loan agreement, Wortley arranged to make a $25,000 payment on the principal owed to the Bank in return for a ninety-day forbearance. Wortley and Johnson tried unsuccessfully to refinance Sea Dog's $1.8 million debt with Camden National Bank and with Pointe Bank in Florida. They also tried to reschedule Sea Dog's payments to its trade creditors.

Wortley did not, however, indemnify Camplin.  Camplin had pledged his home in Lincolnville as collateral on the bank loan. When Camplin sold his home on October 2, 2000, Camden National Bank took the proceeds from that sale, $470,797, to pay down Sea Dog's debt.  In addition, North Center, a food supplier, obtained a judgment against Camplin for approximately $23,000, including interest and costs, on a debt accrued by Sea Dog after Camplin transferred ownership of the company to Wortley.

On October 20, 2000, Camden National Bank wrote Camplin a letter stating that the $1.8 million loan was in default, that the bank planned to foreclose on the collateral and initiate litigation against the guarantors, and that a secured creditor sale of Sea Dog's assets was scheduled for November 21, 2000.  Camplin faxed the letter to Wortley and Johnson.  Camplin also faxed Johnson a letter on November 6, 2000, demanding "the 'more comprehensive stock purchase agreement' contemplated under [clause] 2(b) of the [existing SPA]."

Sea Dog filed for Chapter 11 bankruptcy protection on November 1, 2000.  On November 9, 2000, the bankruptcy court issued the first of several interim cash collateral orders.  By agreement of Sea Dog and Camden National Bank, the orders provided that, so long as there was no further default on Sea Dog's financial obligations to the Bank, the Bank would not seek to recover from Camplin or other third-party guarantors.  These orders stayed in

effect during the bankruptcy. During this period, Wortley loaned several hundred thousand dollars to Sea Dog, in return for which he received liens on some of its assets.

In November or December 2000, Camden National Bank informed both Wortley and Camplin that it had identified a potential buyer for its Sea Dog loan and collateral, including Camplin's guarantee. It invited either man to buy the debt instead. Camplin, fearing that his "guarantees would end up in the hands of strangers," obtained a loan, via a trust, from Fleet Bank that he used to buy the debt on December 19, 2000. Camplin owned the debt through a limited liability company called WWN Group, which, he testified, stood for "Wortley's Worst Nightmare." Camplin, then, through WWN Group, was a creditor of Sea Dog.

In March and April 2001, Camplin adopted a two-pronged strategy, seeking to regain control of Sea Dog while at the same time suing Wortley. On March 14, 2001, Camplin caused WWN Group to publish a notice of a secured creditor's sale with respect to the pledged Sea Dog stock. At the secured creditor's sale on March 23, 2001, WWN Group purchased the stock for $100. Camplin then filed a motion in bankruptcy court seeking authority to close Sea Dog and liquidate its assets. He reversed course on liquidation, though, and on April 27, 2001 Camplin and WWN Group formally agreed to support a reorganization plan proposed by Wortley. Under the plan, the Sea Dog stock would be transferred to Sea Dog Trust, controlled

by Wortley, and the loan that had been purchased by WWN Group from Camden National Bank would be repaid in full over 15 years at an interest rate of 8.5 percent.[6]  The bankruptcy plan was filed in the bankruptcy court on July 6, 2001 and confirmed by the court on August 20, 2001.  As of April 30, 2002, the date of Camplin's testimony in the federal trial, Sea Dog had made all monthly payments to Camplin and WWN Group required by the plan.[7]

Camplin filed a complaint against Wortley and Johnson in Maine state court on March 12, 2001.  The Wortleys then brought suit in the U.S. District Court for Maine, and Camplin filed a counterclaim against the Wortleys there, which tracked his state court claims.  In federal court, Camplin counterclaimed for violations of Section 10-b and Rule 10b-5; breach of contract; fraud; fraudulent inducement; intentional infliction of emotional distress; fraudulent transfer; violation of Me. Rev. Stat. Ann. tit. 32, § 10201 (West 2003); and negligent misrepresentation.  He sought a range of remedies including punitive damages and double damages.  Wortley brought many of the same claims against Camplin -- for violation of Section 10-b and Rule 10b-5; violation of Me. Rev. Stat. Ann. tit. 32, § 10201; fraud; negligent

---

[6] As noted, Camden National Bank had applied the proceeds of the sale of Camplin's home in Lincolnville to Sea Dog's debt.  The reorganization plan would have repaid these proceeds to Camplin.

[7] Camplin argues before this court, however, that since the trial Wortley has defaulted on his obligations under the reorganization plan.

misrepresentation; and breach of contract -- as well as a claim for breach of warranty under Maine's version of the U.C.C., Me. Rev. Stat. Ann. tit. 11, § 8-1108 (West 2003). Wortley's claims derived mainly from Camplin's alleged failure to reveal that the Sea Dog stock he sold in spring 2000 was already pledged to Camden National Bank.

Both parties sought summary judgment on the claims asserted against them. On February 13, 2002, the district court affirmed the decision of the magistrate judge denying Camplin's motion and granting Wortley's motion in part. It dismissed all of Camplin's claims against Mrs. Wortley and his claims against Mr. Wortley for breach of contract, intentional infliction of emotional distress, fraudulent transfer, negligent misrepresentation, and punitive damages.

The case was tried before a jury and, after the conclusion of each party's case in chief, the district court heard motions from both sides for judgment as a matter of law. Wortley sought a directed verdict, inter alia, on Camplin's federal securities law claim, arguing that Camplin had failed to demonstrate that Wortley was either a seller or a purchaser of stock under the statute. The district court rejected this argument. It granted Camplin's motion for judgment as a matter of law on Wortley's U.C.C. warranty claim, but denied Camplin's motion on Wortley's breach of contract claim.

-13-

The jury found that Wortley committed federal securities law fraud and awarded Camplin $265,000 in damages. It found for Wortley on Camplin's other claims, and found for Camplin on Wortley's claims. The district court awarded Camplin half his costs. Wortley again moved for judgment as a matter of law on the federal securities law verdict. He contested both the sufficiency of the evidence supporting several elements of the Section 10-b claim and the legal and factual basis for the damages award. The district court denied this motion in a decision and order dated August 9, 2002. This appeal followed.

II.

A. Dismissal of the Warranty Claim

The Wortleys asserted that Camplin had violated a statutory warranty under Maine's version of the U.C.C. by transferring to them Sea Dog stock in March 2000 which was under pledge to a bank. This issue is controlled by Maine law.

The statutory U.C.C. warranty provides:

A person who transfers a certificated security to a purchaser for value warrants to the purchaser . . . that:
. . . .
(b)    The transferor . . . does not know of any fact that might impair the validity of the security;
(c)    There is no adverse claim to the security;
(d)    The transfer does not violate any restriction on transfer;
. . . .
(f)    The transfer is otherwise effective and rightful.

-14-

Me. Rev. Stat. Ann. tit. 11, § 8-1108(1). After hearing the evidence at trial, the trial court entered judgment against the Wortleys, finding:

> I'm granting the motion by the defendant for judgment as a matter of law under the UCC warranty claim. That arises under Article 8 of the Uniform Commercial Code, . . . Section 8-1108(1)(c), by which there is an automatic warranty to the purchaser that there is no adverse claim to the security when a certificate of security is transferred. There's also warranty under Subsection (d) that the transfer does not violate any restriction on the transfer.
>
> Passing the question who purchased here, under the circumstances as they've been presented, Mr. Camplin would seem to have violated both at the time of the transfer, but there is nothing in UCC law that prevents waiving that warranty. Instead, Article 1, Section [1-102], rather, provides very clearly that the effect of provisions of this title may be varied by agreement except as otherwise provided in this title. Title being Title 11 which is the whole Uniform Commercial Code.
>
> Then there are certain other specific sections like good faith and reasonableness. And the language is that the effect may be varied. And I find therefore that the statute does not require that a waiver actually refer to the statute. Here the waiver of warranties that Mrs. Wortley signed as the purchaser, the assignee of the rights under the purchase, expressly waived warranties in the purchase and sale agreement that were identical to the statutory ones. So I conclude as a matter of law that the statutory [warranty] was waived at the same time as the contractual warranties were waived.

Our review of the court's ruling on the statutory warranty claim is de novo.

This ruling is based on a May 1, 2000 letter to Camplin, sent by and signed by the Wortleys. That letter provided:

> Pursuant to Section 1 of the Stock Purchase Agreement, Barbara Wortley hereby waives all the conditions set

-15-

> forth in Section 2 of the Stock Purchase Agreement that have not yet been fulfilled.

The conditions set forth in section 2 of the Stock Purchase Agreement were the same as the statutory U.C.C. warranties.  The letter was apparently drafted by the Wortleys' counsel, since this letter asked Camplin to send documents to their counsel and an attached cover letter was signed only by their counsel.  It is not clear if the reason for the proferred waiver was to expedite the deal or for some other purpose.

Wortley argues the issue of breach of statutory warranty should have gone to the jury because the meaning of the letter was ambiguous, and because there were issues of fact as to whether any waiver was knowing or voluntary and as to Camplin's good faith.[8]

Wortley argues that the waiver in the May 1, 2000 letter is ambiguous in light of the next sentence in the letter:

> Accordingly, we hereby request that you sign and return . . . the enclosed Stock Power, together with the original stock certificates evidencing shares of stock in Sea Dog Brewing Co. and the original stock transfer ledger and corporate record books of Sea Dog Brewing Co.

---

[8] The Wortleys also argue in their reply brief that if the breach of contract claim as to a covenant was permitted to go to the jury, then, ipso facto, the warranty claim should have gone to the jury.  The argument, made for the first time in a reply brief, comes too late.  See JCI Communications, Inc. v. Int'l Bhd. of Elec. Workers, Local 103, 324 F.3d 42, 51 n.8 (1st Cir. 2003).  In any event, the jury rejected the Wortleys' breach of contract claim.

-16-

It is clear that the May 1 waiver satisfies the terms of U.C.C. § 1-107, which provides:

> Any claim or right arising out of an alleged breach can be discharged in whole or in part without consideration by a written waiver or renunciation signed and delivered by the aggrieved party.

The Wortleys' argument that the release language is ambiguous, an issue of law for the judge under Maine law, borders on the frivolous. See Town of Lisbon v. Thayer Corp., 675 A.2d 514, 516 (Me. 1996). The waiver is clearly unambiguous.

The Wortleys' more serious argument is that a waiver under U.C.C. § 1-107 can never waive the good faith requirement under U.C.C. § 1-203 because U.C.C. § 1-102(3) provides:

> (3) The effect of provisions of this Act may be varied by agreement, except as otherwise provided in this Act and except that the obligations of good faith, diligence, reasonableness and care prescribed by this Act may not be disclaimed by agreement but the parties may by agreement determine the standards by which the performance of such obligations is to be measured if such standards are not manifestly unreasonable.

They argue there is a material issue of fact as to Camplin's bad faith non-disclosure that the stock was pledged and that dispute of fact, in combination with the non-waivability of the good faith requirement, means that summary judgment was erroneously entered. The trial court assumed that Camplin had acted in bad faith, but found that the Wortleys had waived their claim. The trial court

also correctly concluded that there was no material issue of fact as to whether the Wortleys' waiver was knowing and voluntary.

The issue presented is a pure question of law, determined under Maine law: when a party knowingly and voluntarily waives statutory U.C.C. warranty rights, does the U.C.C. preclude application of the waiver to the U.C.C. obligation of good faith? The Maine courts have not addressed this issue, to our knowledge. We agree with the trial judge that Maine law would find the U.C.C. good faith provisions may be relinquished under these circumstances when the supposed bad faith did not induce the Wortleys to execute the waiver.

Maine law does not impose a duty of good faith and fair dealing except in circumstances governed by specific provisions of the U.C.C. Haines v. Great N. Paper, Inc., 808 A.2d 1246, 1250 (Me. 2002). The Supreme Judicial Court of Maine has stressed that the U.C.C. itself "imposes a duty of objective good faith in certain situations." First N.H. Banks Granite State v. Scarborough, 615 A.2d 248, 251 (Me. 1992).

It is generally accepted that the good faith standard of U.C.C. § 1-203 does not create an independent cause of action and that it does not create an obligation conceptually separate from the underlying agreement. 1A R.A. Anderson, Anderson on the Uniform Commercial Code § 1-203:22, at p. 206 (1996 & Supp. 2002). This case does not involve the more common situation of application of

-18-

the good faith obligation to a seller's efforts unreasonably to disclaim certain remedies.  See Potomac Plaza Terraces, Inc. v. QSC Prods., Inc., 868 F. Supp. 346, 353 (D.D.C. 1994) ("Most jurisdictions . . . hold that a seller who acted in bad faith may not claim the benefit of a limitation of remedy that by itself would be valid.") (internal quotation omitted).

Rather, this case involves a written waiver of statutory warranties, under U.C.C. § 1-107, which was a voluntary relinquishment of rights.  We think the Maine courts, given their relatively strict approach to the concept of good faith obligations, would choose to read U.C.C. § 1-102(3) and § 1-107 as referring to the good faith in entering into the waiver or renunciation rather than to the good faith in connection with the underlying claim or right which is discharged.  1 Anderson, supra, § 1-107:7, at p. 476 n.12 (acknowledging ambiguity).  Since none of the Wortleys' evidence on this issue went to their somehow being induced in bad faith by Camplin to waive their warranties, summary judgment was appropriately entered on the claim.

B.  The Jury Verdict of Violation of Section 10-b

Joseph Wortley argues that there was insufficient evidence to support several elements of Camplin's claim under Section 10-b and Rule 10b-5.  The burden was on Camplin to prove that (1) Wortley made a materially false or misleading statement or failed to state a fact necessary to make a statement not misleading;

(2) in connection with the purchase or sale of a security; (3) with the intent to deceive, manipulate, or defraud; and that (4) Camplin was injured by his reasonable reliance on Wortley's misrepresentations. See 17 C.F.R. § 240.10b-5; Geffon v. Micrion Corp., 249 F.3d 29, 34 (1st Cir. 2001); Shaw v. Digital Equip. Corp., 82 F.3d 1194, 1216-17 (1st Cir. 1996).

First, Wortley argues there was insufficient evidence that he acted with the requisite state of mind to meet the scienter requirement. Scienter embraces intent to deceive, manipulate or defraud. In re Cabletron Sys., Inc., 311 F.3d 11, 38 (1st Cir. 2002). To establish scienter, Camplin must show either that Wortley "consciously intended to defraud," or that he acted with "a high degree of recklessness." Aldridge v. A.T. Cross Corp., 284 F.3d 72, 82 (1st Cir. 2002); see also Greebel v. FTP Software, Inc., 194 F.3d 185, 198-201 (1st Cir. 1999) (discussing scienter requirement).

Wortley relies on the rule that mere breach of a promise is not itself enough to establish fraudulent intent for a federal securities law violation. Gurary v. Winehouse, 235 F.3d 792, 801 (2d Cir. 2000); see U.S. Quest Ltd. v. Kimmons, 228 F.3d 399, 407 (5th Cir. 2000); see also A.T. Cross Corp., 284 F.3d at 83 ("Of course, more than mere proof that the defendants made a particular false or misleading statement is required to show scienter."). The remedy in such a situation is an action for breach of contract. See Mills v. Polar Molecular Corp., 12 F.3d 1170, 1176 (2d Cir. 1993).

Wortley argues that he never promised to indemnify Camplin on Camplin's personal guarantee to the bank. He admits he did promise to pursue various options in order to protect Camplin, but says he met that obligation. He argues that his promise to "stand between [Camplin] and the Bank" could not be understood to impose any duty on him to do more than what he did do.

The district court considered this issue of the dividing line between fraud and a mere failed promise to be very close, but appropriately resolved to let it go to the jury. When the issue was raised again post-trial in Wortley's motion for judgment as a matter of law or for a new trial, the trial judge rejected the argument. So do we. When the defendant makes a specific promise, as part of the consideration for the transfer of securities, to perform an act, while intending not to perform the act, this may constitute a basis for a fraud finding. See United Int'l Holdings, Inc. v. Wharf (Holdings) Ltd., 210 F.3d 1207, 1221 (10th Cir. 2000) (collecting cases); Luce v. Edelstein, 802 F.2d 49, 55 (2d Cir. 1986).

Similarly, in a case dealing with the statutory exceptions to bankruptcy for false representations, 11 U.S.C. § 523(a)(2)(A) (2000), this court set forth standards which are useful in assessing scienter for Securities and Exchange Act purposes:

> [T]he concept of misrepresentation includes a false representation as to one's intention, such as a promise to act. A representation of the maker's own intention to do . . . a particular thing is fraudulent if he does not have that intention at the time he makes the representation. . . . Likewise, a promise made without

the intent to perform it is held to be a sufficient basis for an action of deceit. On the other hand, if, at the time he makes a promise, the maker honestly intends to keep it but later changes his mind or fails or refuses to carry his expressed intention into effect, there has been no misrepresentation. This is true even if there is no excuse for the subsequent breach.

Palmacci v. Umpierrez, 121 F.3d 781, 786-87 (1st Cir. 1997) (quotations and citations omitted). See generally In re Baylis, 313 F.3d 9, 20 (1st Cir. 2002) (noting usefulness of analogy between 11 U.S.C. § 523(a) and securities law requirement of scienter).

This is where Wortley's theory of defense circles back to bite him. Wortley, consistent with his theory that he never indemnified Camplin, testified that he never intended to indemnify Camplin. Once the jury found, as it permissibly did on the evidence, that Wortley had effectively promised to indemnify Camplin, it was easy to conclude from his own testimony that he never intended to keep the promise. From the evidence, a jury could reasonably conclude that the language Wortley used meant indemnity and that the company, which sold for $100, would never have been sold if Camplin had not been promised that he would be indemnified on his personal guarantee to the bank on $1.8 million of corporate debt; that Camplin had made that clear to Wortley; and that Camplin had turned down an earlier offer to buy Sea Dog because it did not include such an indemnification agreement. This evidence also disposes of the Wortleys' claim on appeal that Camplin had not shown reasonable reliance on any misleading statements. See Castellano

-22-

v. <u>Young & Rubicam, Inc.</u>, 257 F.3d 171, 186 (2d Cir. 2001) (reliance presumed where securities fraud claim is based on material omission).[9]

Wortley's last argument as to liability is that there were intervening causes which prevent Camplin from showing loss causation. It is a statutory requirement that plaintiff demonstrate that the acts complained of "caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. § 78u-4(b)(4). Proximate causation and intervening cause are usually issues for the jury to resolve. <u>Exxon Co., U.S.A.</u> v. <u>Sofec, Inc.</u>, 517 U.S. 830, 840-41 (1996) ("The issues of proximate causation and superseding cause involve application of law to fact, which is left to the factfinder, subject to limited review."); <u>Veilleux</u> v. <u>Nat'l Broad. Co.</u>, 206 F.3d 92, 124 (1st Cir. 2000) ("Proximate cause is generally a question of fact for the jury.").

The defense argument is that Wortley intended to fulfill all of his promises to the plaintiff but intervening events rendered him unable to do so and so it could not reasonably be concluded from his failure to keep his promises that he did not intend to keep them. This was, on the facts, a plausible argument for Wortley to make to the jury. The jury heard it and rejected it and had an

---

[9] Since this evidence as to indemnity on the personal guaranty alone was sufficient to show liability and some resulting damages, we do not discuss the other promises said to have been made and broken as a basis for a scienter finding (i.e., employment of Camplin's sons, the $108,000 advance, etc.).

adequate basis to do so.  To the extent this argument is tied to the measure of damages, it also fails.  There was evidence that the bank later took proceeds from the sale of Camplin's house to pay down the Sea Dog debt on his personal guarantee and that Camplin lost $471,000 in equity as a result.

## C.  Measure of Damages

When there has been a violation of Section 10-b, the ordinary measure of damages is for a defrauded seller to recover the difference between what the seller received for the shares and the fair market value of the shares at the time of the sale.[10]  Lawton v. Nyman, 327 F.3d 30, 42-43 (1st Cir. 2003); see also Affiliated Ute Citizens v. United States, 406 U.S. 128, 155 (1972).  There is no claim that the jury instructions concerning the measure of

---

[10]  The exception whereby courts award the plaintiff the defendant's profits to avoid unjust enrichment plays no role here, since there was no windfall.  See Lawton v. Nyman, 327 F.3d 30, 42-43 (1st Cir. 2003).

damages were in error.[11]   Rather, Wortley argues that the jury

lacked sufficient evidence to calculate the damages that it awarded.

Neither side presented expert testimony on the fair value

of the shares at the time of the sale.  Wortley argues that the

jury's verdict is unsupported by sufficient evidence because Camplin

did not present expert testimony to prove his damages.  The cases

of which this court is aware that can be read to require expert

testimony on damages in federal securities fraud cases all involve

court review of the sufficiency of a class action settlement.  See,

e.g., In re Sunbeam Sec. Litig., 176 F. Supp. 2d 1323, 1331 (S.D.

Fla. 2001); Behrens v. Wometco Enters., 118 F.R.D. 534, 542 (S.D.

---

[11] The trial court correctly instructed, without objection:

As damages, you may award the amount by which the fair value of the Sea Dog stock on May 2, 2000, exceeded the fair value of all that Peter Camplin, Sr., actually received from Joseph Wortley as payment for the Sea Dog stock.

You may also award out of pocket expenditures that Peter Camplin, Sr., reasonably undertook in justifiable reliance on any fraud you have found, but you may not consider expenses he would have incurred regardless of any fraud.

In determining the fair value of all that Peter Camplin, Sr., received, you may consider both actual monies and the fair value of promises kept in payment for the Sea Dog stock.

In determining the fair value of the business, you may consider as of the date of the sale, Sea Dog's assets and liabilities, data regarding Sea Dog's financial status and then anticipated future appreciation or depreciation, outstanding claims against Sea Dog, the management of the business and the marketability of the business.

The court also instructed that the damages had to be actual, could not be speculative, and could not be used to punish a party.

Fla. 1988); In re Warner Communications Sec. Litig., 618 F. Supp. 735, 744 (S.D.N.Y. 1985); Burger v. CPC Int'l, Inc., 76 F.R.D. 183, 188 (S.D.N.Y. 1977). In that situation, expert testimony serves the useful roles of reducing the risk of collusion or conflict of interest and apportioning damages between class members. Those sources of complexity are absent here. We hold that, although expert testimony on damages is likely to be helpful, it is not required in every category of federal securities fraud case. See Huddleston v. Herman & MacLean, 640 F.2d 534, 553-54 (5th Cir. 1981), aff'd in part, rev'd in part on other grounds, 459 U.S. 375 (1983); cf. Sowell v. Butcher & Singer, Inc., 926 F.2d 289, 301 (3d Cir. 1991) (noting that securities fraud plaintiffs generally present expert testimony about damages, but not requiring such testimony).

Wortley also argues that the damages were too speculative in the sense that during the time period in question, March 21, 2000 through April 7, 2000, Sea Dog was insolvent and about to go out of business, and he had paid a fair value for a debt ridden, failing company. Wortley argues, "Sea Dog clearly would have failed in the spring of 2000, absent the transaction with Wortley."[12] If Sea Dog had failed, Wortley argues, Camplin would have suffered all of his damages anyway: he would not have been able to stave off the bank

[12] Wortley also attacks a number of specific elements of damages, but there is adequate evidence to support the damages on each of those points.

-26-

on his personal guarantee; his sons would not have continued to be employed at Sea Dog; and he would have inevitably lost the $108,000 he advanced to Sea Dog.

The trial judge rejected the defendant's post-verdict attack on the damages, saying:

> The jury heard evidence from both sides about the value of the Sea Dog stock, including the company's financial difficulties and "going concern" value, the restaurants' working assets, the value of an option on property in Bangor, the bank debt, and the trade-creditor debt. The jury also heard about the things that Wortley gave to or did for Camplin (including any partial performance of the promises). Finally, there was evidence from which the jury could have found that Camplin suffered consequential damages as a result of Wortley's failure to renegotiate the Sea Dog debt and relieve Camplin of his personal guarantees. It is not obvious from the $265,000 figure which of this evidence the jury credited, but there is no question that there was sufficient evidence to support the jury's conclusion. This was not a simple case. The parties presented conflicting, often contradictory, accounts of a protracted dispute between two seasoned businessmen. I see no reason to disturb the jury's verdict.

Like the trial judge, we think the evidence adequate, even if the precise figure of $265,000 is not neatly traced to a particular claim of liability.

"In reviewing an award of damages, the district court is obliged to review the evidence in the light most favorable to the prevailing party and to grant remittitur or a new trial on damages only when the award 'exceeds any rational appraisal or estimate of the damages that could be based upon the evidence before it.'" E. Mountain Platform Tennis, Inc. v. Sherwin-Williams Co., 40 F.3d 492,

502 (1st Cir. 1994) (quoting Kolb v. Goldring, Inc., 694 F.2d 869, 872 (1st Cir. 1982)).   Since Wortley did not ask for special verdicts, we follow the rule that a jury need not break down a verdict and attribute it to particular injuries.   See Jackson v. Pool Mortgage Co., 868 F.2d 1178, 1180 (10th Cir. 1989); accord Johnson v. Consol. Rail Corp., 797 F.2d 1440, 1446 (7th Cir. 1986); see also Gen. Indus. Corp. v. Hartz Mountain Corp., 810 F.2d 795, 801 (8th Cir. 1987) (upholding award where special verdict form did not require breakdown of damages); cf. Ramos v. Davis & Geck, 224 F.3d 30, 31-32 (1st Cir. 2000) (district court ruling, that damages award be subject to income tax withholding, was clearly erroneous where verdict form did not cause jury to break down share of damages subject to withholding).

The verdict can be sustained on the conventional theory of damages: the measure of damages is the sale price of the security compared to fair value at the time of sale absent the misrepresentations or omissions.[13]   That is, after all, the theory

---

[13] Wortley argues that the damages award must be set aside to ensure Camplin does not receive double damages under the judgment and the reorganization plan.   This argument fails, inter alia, because it was not adequately preserved below; because the reorganization plan would not compensate Camplin for the full range of broken promises (e.g., the promise to repay the $108,000); and because there was at the time of the verdict a strong possibility (now apparently a reality) that Wortley would eventually default on his plan obligations.   The jury's attempt to discount for the possibility that Wortley would adhere to the reorganization plan might explain the fact that the $265,000 award is not neatly traceable to any single figure before the jury.

on which the jury was instructed and most likely formed the basis of the verdict. A reasonable jury could reject the claim that the true value of Sea Dog was only $100 as of the time of the sale. It was not inevitable at the time of sale that the company would fail or be worthless.

Dirigo Partners, Ltd. appraised the value of Sea Dog as a going concern as $3.5 million in 1997. Camplin testified that Sea Dog's losses during the late 1990s were attributable to its venture into bottling, distribution, and marketing of its beers outside the chain's brew pubs. Sea Dog abandoned this part of its business in late 1998. In 1999, Camplin testified, its losses were less than half that of the preceding year and it had a substantial positive cash flow. After the company went into bankruptcy in November 2000, the bankruptcy court approved a reorganization plan, which ultimately was unsuccessful, but which called for full payment of all allowed administrative, secured, and priority claims against Sea Dog. This included full payment (with interest, over a period of years) to Camplin of the approximately $1.16 million of debt remaining from the 1997 bank loan. The jury in fact asked a question about the reorganization plan.

The jury might also have concluded that, upon liquidation, the value of the company's assets would exceed the combined total of the remaining bank debt of around $1.16 million, the other administrative, secured and priority claims of

-29-

approximately $315,000, and the trade creditor debt which Sea Dog had when Wortley took control in May 2000.[14]  The value to Sea Dog of its option on the Bangor property, after paying the cost to exercise it, was estimated or appraised by different parties at $1.7 million, $1.075 million, and $700,000.  According to the reorganization plan filed in July 2001, the Sea Dog equipment, machinery, furniture, fixtures, and inventory had a fair market value of over $764,000 and a liquidation value of nearly $459,000.

The jury might also have used the terms of sale purportedly offered by Wortley and accepted by Camplin at their March 2000 meetings as a basis for measuring fair market value.  At a minimum, a jury could have inferred that the fair market value was the $100 paid, plus the value of Wortley's indemnity on Camplin's personal guarantee of the remaining $1.16 million of Sea Dog indebtedness to Camden National Bank, discounted by the probability that the guarantee would be called.  Camplin testified that, in return for his Sea Dog stock, Wortley promised to take care of the bank loan by, if necessary, paying off the loan himself.  If the jury credited this testimony, then an award representing a fair market value of $265,100 was a conservative award by the jury.

---

[14] Wortley acknowledges in his reply brief (in the context of a different argument) that "the collateral that WWN [Group] retained under the Sea Dog plan [i.e., a security interest in most but not all assets of Sea Dog] clearly had value well in excess of the Bank debt."

We _affirm_ the judgment below.  Costs are awarded to Camplin.