STATE OF MAINE
CUMBERLAND, ss

SUPERIOR COURT
CIVIL ACTION
DOCKET NO. CV-16-249

TUCKER CIANCHETTE, et al.,

     Plaintiffs

v.

ORDER

ERIC CIANCHETTE, et al.,

REC'D CUMB CLERKS OFC
SEP 24 '19 PM2:05

     Defendants

Before the court is plaintiffs' motion to determine the date at which post-judgment interest began to accrue.

On March 5, 2018 the court entered a judgment against defendants based on the jury verdict but expressly noted that it was not a final judgment because judgment had not entered on defendants' equitable counterclaim for disassociation. In that judgment the court also specified that "post-judgment interest shall run from the entry of final judgment at 7.76%."

On March 15, 2018 the court entered judgment for plaintiff Tucker Cianchette dismissing defendants' counterclaim for disassociation, stating, "This represents final judgment on all the claims in this case."

On March 19, 2018 defendants filed a motion for judgment as a matter of law on certain of plaintiffs' claims pursuant to M.R.Civ.P. 50(b) and for a new trial as to all claims pursuant to M.R.Civ.P. 59(a). That motion was denied in an order filed on June 12, 2018, and defendants thereafter appealed.

On June 4, 2019 the Law Court affirmed the judgment. *Cianchette v. Cianchette,* 2019 ME 87.

On July 3, 2019 defendants paid the judgment amounts with interest calculated on the basis that prejudgment interest stopped and post-judgment interest began on June 12, 2018 – the date that the court denied defendants' post-judgment motion.

**Plaintiffs–Timothy Norton, Esq.
Defendants–Lee Bals, Esq.**

Plaintiffs contend instead that post-judgment interest began to run on March 5 or March 15, 2018. Because of the size of the judgment in this case, the difference in whether post-judgment interest started in March or in June is not insignificant.

Jurisdiction

At the outset, defendants argue that since final judgment was entered more than a year ago, the court no longer has jurisdiction to resolve the issue of when post-judgment interest begins to run.

There is authority for the proposition that the court has continuing jurisdiction to resolve issues relating to the interpretation of its judgments. *E.g., Chamberlain v. Harriman*, 2017 ME 127 ¶ 13, 165 A.3d 351. Although that has generally been limited to allowing clarification when judgments are ambiguous, the March 5 judgment specified that post-judgment interest "shall run from the entry of final judgment," and the parties are now disputing the meaning of that term. As a result, this case fits within the court's continuing jurisdiction to resolve ambiguities in the judgment.

Even in the absence of ambiguity, continuing jurisdiction would exist to rule on disputes about pre- and post-judgment interest arising after an appeal. If the court were to decline to hear the pending motion, plaintiffs could then seek a writ of execution including the post-judgment interest that they contend has not been paid.[1] The existing dispute would then have to be resolved by the court in determining the commencement of post-judgment interest for purposes of the writ of execution.

---

[1] The official court form writ of execution (CV-151) includes a space for the post-judgment interest rate to be specified, commencing on the date that the judgment was docketed.

Seeking a writ of execution would not be plaintiffs' only potential remedy. Plaintiffs could also commence an action on the judgment to recover the additional post-judgment interest that they claim has accrued. One way or another, the court would have to resolve the issue.

2

Commencement of Post-Judgment Interest

Under the applicable statute, "post-judgment interest accrues from and after the date of entry of judgment and includes the period of any appeal." 14 M.R.S. § 1602-C(2). Defendants essentially argue that even though judgment was entered in March, the court should ignore the statutory language and rule that post-judgment interest only accrues from the denial of defendants' post-judgment motion in June. The court rejects that view for the reasons sets forth in the First Circuit's decision in *Marshall v. Perez-Arzuaga*, 866 F.2d 521, 523-24 (1st Cir. 1989) (construing the comparable federal statute and federal rules).

The only remaining question is whether post-judgment interest should run from the March 5, 2018 partial judgment or from the March 15, 2018 final judgment. The court previously specified in its March 5 order that post-judgment interest would run from the entry of final judgment. That occurred on March 15, 2018. This is consistent with the principle that in cases where partial judgments are issued, a final judgment is necessary for there to be "a clear dividing line" determining when post-judgment interest begins to accrue. *Dishman v. Unum Life Insurance Co.*, 269 F.3d 974, 991 (9th Cir. 2001).[2]

The entry shall be:

Plaintiffs are entitled to recover post-judgment interest beginning on March 15, 2018.

The clerk is directed to incorporate this order in the docket by reference pursuant to Rule 79(a).

Dated: September 24, 2019

_____
Thomas D. Warren
Justice, Superior Court

Entered on the Docket: 09/24/19

---

[2]     There is, however, a split in the Circuits on this issue. *See Skretvedt v. E.I. duPont de Nemours*, 372 F.3d 193, 217 n.33 (3d Cir. 2004).

3

STATE OF MAINE                                      SUPERIOR COURT
CUMBERLAND, ss                                         CIVIL ACTION
                                                DOCKET NO. CV-16-249

TUCKER CIANCHETTE, et al.,

      Plaintiffs

v.                                                          ORDER

STATE OF MAINE
Cumberland, ss, Clerk's Office

JUN 1 2 2018
/0:11 Pm
RECEIVED

ERIC CIANCHETTE, et al.,

      Defendants

Before the court is a post-trial motion by defendants Eric Cianchette, Peggy Cianchette, and Cianchette Family LLC to set aside the jury verdicts in favor of plaintiffs Tucker Cianchette and CBF Associates LLC. Defendants are seeking judgment as a matter of law pursuant to Rule 50(b) on certain claims and a new trial pursuant to Rule 59(a) on the remaining issues.

This case involved lengthy cross-motions for summary judgment, approximately a dozen pretrial motions in limine which required a day for hearings, and 16 trial days (including one day for jury selection and two days of jury deliberations) beginning on February 9, 2018 and ending on March 1, 2018. At the conclusion of the trial, the jury rendered a substantial verdict for plaintiffs on their breach of contract and fraudulent misrepresentation claims and awarded punitive damages against Eric Cianchette.

The jury found for defendants on plaintiffs' claim that defendants had breached a subsequent contract. The jury also did not find in favor of plaintiffs' claim for punitive damages against Peggy Cianchette.

Defendants contend (1) that a mistrial should have been ordered when Attorney Norton collapsed while cross-examining Eric Cianchette on February 15, (2) that judgment as a matter

of law should be entered for defendants on plaintiffs' claims of fraudulent misrepresentation and breach of fiduciary duty, (3) that the jury instructions given by the court were erroneous in numerous respects, and (4) that the court's rulings with respect to the admissibility of expert testimony were erroneous. Defendants also contend that there was insufficient evidence of malice and lack of good faith to support the jury's verdict on Tucker Cianchette's fraudulent misrepresentation and punitive damage claims.[1]

## 1. Mistrial Motion

Defendants argue that their motion for a mistrial should have been granted after Attorney Norton collapsed on February 15 and the trial was recessed for the remainder of the afternoon. However, the court interviewed all of the jurors individually the following morning in the presence of counsel, informed them that Attorney Norton had been dehydrated, and asked them whether the incident would affect the trial. All of them credibly stated that Norton's collapse would not affect the trial or their ability to evaluate the evidence. The court concluded that all of the jurors could remain impartial and could remain focused on the evidence and therefore denied defendants' motion for a mistrial.

The interview of individual jurors followed the procedure specified in cases such as *State v. Durant,* 2004 ME 136 ¶ 15, 861 A.2d 637. In denying the defense motion for a mistrial, the court was also mindful of the principle that a mistrial should not be granted "except in the rare case when the trial cannot proceed to a fair result and no remedy short of a new trial will satisfy the interests of justice." *E.g., State v. Clark,* 591 A.2d 462, 464 (Me. 1991), quoting *State v. Mason,* 528 A.2d 1259, 1260 (Me. 1987).

---

[1] Tucker, Eric, and Peggy Cianchette will subsequently be referred to by their first names in this order.

2

In their motion defendants point out that emails and letters from Attorney Norton were introduced as trial exhibits. This was not unique to Attorney Norton. Emails and letters from Attorney Marcus and Attorney Clegg, who represented defendants at the trial, were also introduced as exhibits.[2] Counsel for the parties had agreed that although communications to and from the attorneys would be introduced as evidence of the exchange of communications between the parties concerning the dealership and real estate contracts, the attorneys involved would not be called as witnesses and could serve as trial counsel. This was eventually stated on the record at a conference prior to the trial.

Defendants focus in particular on jurors # 59 and # 123. Juror # 59 is a firefighter and EMT who went to aid Attorney Norton after he collapsed. Although defendants suggest that this was improper contact, the contact did not involve any out of court communication with Attorney Norton or any communication with respect to the issues in the case. Until MEDCU arrived, juror # 59 was the most qualified person to evaluate and monitor Attorney Norton's condition. Juror # 59 ceased assisting Attorney Norton as soon as MEDCU arrived. When interviewed, juror # 59 convincingly stated that the incident and his assistance to Attorney Norton would have no effect on his ability to impartially consider the evidence. In the wake of the incident and the interview with juror # 59, counsel did not suggest that juror #59 should be excused. The court sees no reason to reconsider its decision that juror #59's contact with Attorney Norton did not fatally prejudice the trial.

When interviewed, Juror #123 stated that the incident had affected her at the time because she had had to be resuscitated a number of years earlier. Like the other jurors, however, she credibly stated that once the trial resumed she could focus on the evidence and impartially

---

[2] Although Ms. Clegg did not question any witnesses, she sat at counsel table beside Attorney Bals throughout the entire trial. Mr. Marcus did not sit at counsel table but sat behind Attorneys Bals and Clegg for large portions of the trial.

3

consider the contentions of the parties. She also credibly stated that the incident would not cause her to be more sympathetic to Attorney Norton or his clients. Finally, she stated that if she found, as the trial progressed, that she was distracted because of Attorney Norton's collapse, she would inform the court.

In considering the motion for a mistrial the court noted on the record that of all the jurors, juror # 123 appeared to have been the most affected because of her own history. However, defense counsel did not suggest that juror # 123 should be excused.[3] This may have been because during her interview she expressed the opinion that in her experience, agreements had to be in writing before they were binding – a position favorable to the defense on one of Tucker's contract claims.

The only event subsequent to the court's denial of the defense motion for a mistrial is the note that juror #123 submitted after the verdict that she wished to be conveyed to Attorney Norton. While defendants categorize the note as improper contact, it did not take place during the trial and did not involve the merits of the case. The note was not an out of court communication with Attorney Norton during trial but was delivered to the court after the verdict and was made known to defense counsel at the same time that a copy was given to Attorney Norton. The note did not constitute juror misconduct.

The remaining question is whether the note is evidence that juror # 123 was sufficiently impacted by Attorney Norton's collapse that it could be found that her participation in the verdict or the verdict as a whole was likely infected by extraneous information. First, no presumption of prejudice arises because what defendants characterize as extraneous information did not relate to the issues in the case. *See State v. Kaler,* 1997 ME 62 ¶ 12, 691 A.2d 1226.

---

[3] Because of the expected length of the trial, there were at that time three alternate jurors available. Subsequently, the first alternate became a regular juror when juror # 1 was excused due to illness.

4

Second, the note does not demonstrate that Juror # 123 had been incorrect in stating that her ability to evaluate the evidence would not be affected. Although the note attached a pamphlet relating to sudden death from arrhythmia, the words written by juror #123 – "just covering all bases" – indicate that this was an incidental issue in her mind as opposed to a major concern.

The court concludes that the note does not establish a likelihood that juror #123's evaluation of the evidence was tainted by concern for Attorney Norton or that any concern she may have had would have affected other jurors.[4] A new trial should not be ordered unless the court concludes that it is reasonably clear that prejudicial error has been committed or that substantial justice has not been done. *E.g., Davis v. Currier,* 1997 ME 199 ¶ 7, 704 A.2d 1207. On this issue the court does not find that there is a sufficient showing of prejudice to conclude that it is reasonably clear that there has been a failure of substantial justice.

## 2. Motion for Judgment as a Matter of Law – Fraud Claim

On their motion for judgment as a matter of law, defendants contend that the case should have been tried as what they categorize as "a simple breach of contract case." Initially, this is based on their argument that Tucker's fraudulent misrepresentation claim should have been dismissed based on the Law Court's 1931 decision in *Shine v. Dodge,* 130 Me. 440, 443, 157 A. 318, 319 (1931). The court has previously ruled on that issue and adheres to its prior ruling.

---

[4] The nine-person jury was unanimous that Eric and Peggy were liable for breach of contract and fraudulent misrepresentation, unanimous as to the breach of contract and fiduciary duty claims against Peggy with respect to PET LLC, and unanimous as to the award of damages on the dealership and real estate contract claims. Eight of the jurors joined in the award of damages on the PET claims, on the finding that Eric had acted with malice, and on the punitive damage award against Eric. Seven jurors joined in the finding – in favor of defendants – that there had been no subsequent agreement reached by the parties in March 2016. The jury split 5-4 on the issue of whether Peggy had acted with malice and therefore was not asked to consider any punitive damage award against Peggy.

In this connection it bears emphasis that while nominally adhering to its ruling in *Shine*, the Law Court has since twice ruled that, depending on the circumstances, promises of future performance may constitute averments of fact that can constitute fraudulent misrepresentations. *Boivin v. Jones & Vining Inc.*, 578 A.2d 187, 188-89 (Me. 1990); *Wildes v. Pens Unlimited Co.*, 389 A.2d 837, 840-41 (Me. 1978). In the *Boivin* case, the Law Court quoted Restatement 2d of Torts § 525 for the proposition that a person "who fraudulently makes a misrepresentation of fact, opinion, intention, or law" may be subject to liability (emphasis added).

This is not a case where Tucker contended that defendants' misrepresentations consisted solely of signing contracts that they subsequently breached. Tucker's misrepresentation claim was based on the theory that defendants professed for some time to be willing to sell their interests in the dealership – when they had no intention of doing so – and continued to string him along, initially in an effort to have him forfeit his interest in the dealership and subsequently with the intent to punish him by extracting a non-refundable deposit and subjecting him to an exercise in futility. There was sufficient evidence to support the jury's verdict for Tucker on this claim under a clear and convincing evidence standard.

Defendants contend that damages for the benefit of the bargain are unavailable in fraudulent misrepresentation cases. The court disagrees. *See* Restatement 2d of Torts § 549(2) and comments (g) and (h). Defendants also contend that the economic loss doctrine – applicable in product liability cases[5] – should be extended to preclude economic damages for fraudulent misrepresentation. The court sees no basis to extend the economic loss doctrine to fraud cases – especially because in fraud cases only pecuniary losses can be recovered. *Jourdain v. Dineen*, 527 A.2d 1304, 1307 (Me. 1987).

---

[5] *See Oceanside at Pine Point Condo Owners Ass's v. Peachtree Doors Inc.*, 659 A.2d 267 (Me. 1995).

6

Defendants' remaining argument under Rule 50(b) reiterates their contention during trial that Tucker was required to elect between his contract claim and his fraudulent misrepresentation claim prior to the submission of the case to the jury.[6] One problem with this argument is that to the extent that parties are required to elect between claims, they are only required to do so if the claims depend on "inconsistent and repugnant" versions of the facts. *Carey v. Cyr,* 150 Me. 405, 407, 113 A.2d 614, 616 (1955), quoted in Defendants' Post Verdict Motion at 13. In this case there was no inconsistency between Tucker's claim that Eric and Peggy falsely represented that they would sell their interest in the Casco Bay Ford dealership if Tucker met the necessary contractual requirements – when they had no intention of doing so – and his claim that Eric and Peggy breached the subsequent agreement that was reached.

Moreover, to the extent that parties are required to elect between claims, the purpose is to avoid double recovery. Defendants did not object to the jury instruction that if Tucker prevailed on both his fraudulent misrepresentation claim and his contract claim, the damages would be the same.[7] There is no double recovery in the judgment entered against defendants.

---

[6] Defendants are advancing the argument that Tucker was required to elect his claims, not that he was required to elect his remedies. Defendants' Post Verdict Motion at 12-13 ("It should be clear that Defendants are not arguing that Plaintiffs were required to elect *remedies* prior to the verdict. Rather, Defendants maintain that Plaintiffs were required to elect which *claim* to pursue") (emphasis in original).

[7] If Tucker had prevailed on his claim for fraudulent misrepresentation but had not prevailed on his claim for breach of contract, he would have been entitled to an award of any losses he incurred in reliance on defendants' false representations that they were prepared to sell their interests in the dealership – primarily the $150,000 nonrefundable deposit that defendants required as part of the transaction. When Tucker prevailed on his contract claim, the $150,000 deposit was part of the purchase price and properly considered part of the cost that Tucker would have incurred if the contract had closed. In the contract damage calculations offered by plaintiffs, the amount of the purchase price was subtracted. The jury instructions stated that any damages awarded for breach of contract should subtract costs, such as the purchase price, that plaintiffs would have incurred if the contracts had closed.

7

### 3. Motion for Judgment as a Matter of Law – Breach of Fiduciary Duty and Contract Claims relating to PET LLC

On these issues defendants mostly reiterate arguments that they made in their motion for summary judgment. Recognizing that some of these issues involve questions of law that have not been addressed by the Law Court, the court sees no reason to depart from its prior rulings.

Defendants also argue that there was no evidence in the record from which the jury could have determined an appropriate interest rate on the $375,000 interest-free loan from PET LLC to Cianchette Family LLC. This was an issue on which, in closing argument, plaintiffs' counsel suggested that Tucker's damages would be $20,000. The interest rate that plaintiffs suggested should have been applied was the interest rate charged by Ford Credit, and in her testimony Peggy acknowledged that she had testified in her deposition that the Ford Credit interest rate was 4.25%.

### 4. Punitive Damages

Although defendants raise their objections to the punitive damage award under the heading of alleged errors in jury instructions, they are primarily arguing that Tucker's claim for punitive damages should not have been submitted to the jury.[8]

On that issue they point out that punitive damages are not available in contract cases, an argument that depends on their contention – rejected above – that defendants are entitled to judgment as a matter of law on Tucker's fraudulent misrepresentation claim. They also argue that Tucker failed to prove malice by clear and convincing evidence, contending that the only

---

[8] Defendants' only specific argument with respect to jury instructions on the issue of punitive damages is their contention that the jury should not have been instructed as to the meaning of malice. Defendants' Post Verdict Motion at 16. The wording of the malice instruction came from Alexander's Maine Jury Instruction Manual § 7-114 (2017-18 ed.). Moreover, the court does not recall any objection by defense counsel to the wording of the punitive damage instruction, only to whether the punitive damage claim should go to the jury.

8

evidence of malice consisted of isolated items of circumstantial evidence. Defendants' Post Verdict Motion at 2. The problem with this argument is that, in addition to circumstantial evidence, plaintiffs offered direct evidence that the jury was entitled to consider as evidence of malice, including the statement by Eric that he wanted a $150,000 non-refundable deposit to "make it hurt," Eric's statements berating Tucker at a meeting in early February 2016 after the deal fell through, and most notably Eric's phone call to Bob Esposito.

To be sure, in the heat of an argument, family members sometimes say hurtful things to each other that they do not really mean. Given the nature of Eric's statements and the other evidence in this case, the jury was entitled to conclude that Eric's statements did not fall into that category. There was sufficient evidence to support the jury's decision that it was highly probable that Eric acted with malice.

With respect to the Esposito phone call, defendants now contend that this was triggered by the inability of Eric and Peggy to see their grandchildren and that Eric later apologized. Notwithstanding a subsequent apology (made to Esposito, not to Tucker), the jury was entitled to conclude that what Eric told Esposito initially was what Eric actually thought. In addition, to the extent that defendants now contend that the Esposito call resulted from Eric and Peggy's inability to see their grandchildren, the defense did not offer any evidence to that effect at trial.

Prior to the trial, plaintiffs' counsel moved in limine to exclude any reference to grandchildren. At that time, defense counsel argued only that they should be allowed to raise a reference to the grandchildren that was contained in a text sent by Wendy Ayotte and that Eric should also be entitled to testify that in purchasing the dealership he was motivated by a desire to

9

help his grandchildren. In both instances, the court permitted the specific evidence which the defense sought to raise but otherwise granted plaintiffs' motion in limine.[9]

In response to plaintiffs' motion in limine, defendants did not argue that they should be allowed to elicit evidence that Eric's phone call to Esposito was triggered by issues with respect to the grandchildren. Moreover, although decisions on pretrial motions in limine are always subject to reconsideration at trial – a point which the court recalls making during argument on the parties' pretrial motions in limine in this case – defendants never made a further request to offer that evidence at trial.[10]

Defendants' final argument on the issue of punitive damages is that it was improper to allow plaintiffs' counsel to argue for a punitive damage award based on the $ 3.1 million contract damage award. The court does not recall any specific request by the defense to preclude such an argument. In any event, under the jury instructions, the $3.1 million award represented benefit of the bargain damages for fraudulent misrepresentation pursuant to Restatement 2d of Torts § 549(2) and was therefore an appropriate subject for argument.

## 5. Jury Instructions

Defendants argue that the jury was erroneously instructed with respect to (1) the Ford Motor Credit release, (2) the Contingency Agreement, (3) anticipatory breach, (4) the business

---

[9] *See* Plaintiffs' Second Motion in Limine to Exclude Evidence Regarding Tucker Cianchette's Children, dated January 18, 2018; Defendants' Opposition to that motion dated February 6, 2018; and the court's order on that motion dated February 8, 2018.

[10] In the interest of completeness, defense counsel did raise the possibility during the trial – off the record – that the defense might seek to offer evidence that the Esposito call was motivated by issues with respect to the grandchildren. However, the defense never followed through with an actual request on the record to elicit that testimony. Defendants therefore did not preserve this issue and cannot now rely on evidence that was not offered to explain the Esposito call.

judgment rule, and (5) ratification. On those issues the court is unpersuaded and will rely on the rulings made at trial with the following additional comments:

(a) Ford Motor Credit Release. What defendants characterize as an issue of law was in fact an issue of fact – whether the draft release obtained in December 2015 met the terms of the purchase agreement. The court instructed the jury that the purchase and sale agreement required releases from "any potential personal guarantee liability with respect to the time period prior to the closing as well from any potential personal guarantee liability with respect to the time period after the closing." Anything further would have constituted a comment on the evidence.

There was nothing that prevented the defense from arguing that the undisputed testimony from Vincent Talia demonstrated that the December 2015 draft release only applied to potential liability after the closing and therefore did not meet the requirement of the purchase and sale agreement.[11] Indeed, it is the court's recollection that the defense made precisely that argument.

(b) Contingency Agreement: The court declined to construe the Contingency Agreement as a matter of law because it concluded that certain language in that Agreement was ambiguous. However, there was nothing to prevent the defense from directing the jury's attention to the Contingency Agreement and arguing that Tucker had not complied with the Contingency Agreement. The court does not recall whether that argument was made in the defense's closing.

(c) Anticipatory Breach: There was no evidence from which the jury could have found that Tucker ever repudiated his obligations under the purchase and sale agreement. *See* Restatement 2d of Contracts § 253.

(d) Ratification: The court declined to give this instruction with respect to Tucker's claims based on the PET LLC Operating Agreement and Peggy's duty of good faith and fair

---

[11] Tucker's argument was that the evidence demonstrated that a satisfactory release could have been obtained if defendants had raised the issue prior to closing and that, if they had waited to raise the issue at the closing, he had a right to extend the closing in order to obtain a satisfactory release.

11

dealing as Manager under that agreement because Tucker was a minority member who could not have approved the transactions in question. There was nothing, however, to prevent the defense from arguing that the absence of any contemporaneous objections by Tucker demonstrated that Tucker saw nothing wrong with the transactions.

## 6. Expert Testimony

With respect to the rulings on expert testimony, the court sees no reason to revisit the rulings it made on the pertinent motions in limine and at trial with the following additional points:

The opinions defendants characterize as too speculative are Filler's reliance on one year as a basis for estimating the profitability of the dealership, Filler's extrapolation of potential profits over a lengthy time period,[12] and Zalud's opinion that although there will be changes in the type and mix of vehicles sold, there will be no fundamental changes in the automotive marketplace that will affect the viability of a Maine Ford dealership in the foreseeable future. This testimony was extensively challenged by defense counsel in cross-examination and in closing argument. It involved issues that a lay jury could understand and evaluate. These were not issues that were too abstruse for anyone but an expert to understand.

The jury was then instructed that "damages may not be based on guesswork and speculation" and that damages based on lost profits "may only be awarded to the extent that the lost profits can be estimated with reasonable certainty." Ultimately the jury did not adopt Filler's proposed damage calculations and awarded dealership contract damages of $3.1 million (as

---

[12] Although offering an opinion based on a 27-year period, Filler offered alternate estimates based on various time periods lasting from 10 to 27 years.

12

opposed to Filler's $6.5 million number) and real estate contract damages of $750,000 (as opposed to Filler's $1.4 million number).

The entry shall be:

Defendants' motion for a new trial and for judgment as a matter of law is denied. The Clerk is directed to incorporate this order in the docket by reference pursuant to Rule 79(a).

Dated: June _12_, 2018

Thomas D. Warren
Justice, Superior Court

STATE OF MAINE
CUMBERLAND, ss

SUPERIOR COURT
CIVIL ACTION
DOCKET NO. CV-16-249

TUCKER CIANCHETTE, et al.,

Plaintiffs

v.

ERIC CIANCHETTE, et al.,

Defendants

STATE OF MAINE
Cumberland, ss. Clerk's Office

JAN 12 2018
2:45 ₱ᵐ.
RECEIVED

ORDER

This case arises from an attempt by Tucker Cianchette to buy out the interests of his father

and stepmother, Eric Cianchette and Peggy Cianchette, in PET LLC, a family corporation that

owns the Casco Bay Ford car dealership.[1] Tucker contends that Eric and Peggy breached an

agreement to sell their interests in the LLC and that, after a second purchase and sale contract was

agreed, Eric and Peggy breached that agreement as well. Tucker also has asserted claims against

Eric and Peggy in connection with the management of PET LLC.

For their part, Eric and Peggy respond that they had the right to terminate the purchase

agreement, that no enforceable subsequent agreement was reached, and that Tucker's other claims

fail as a matter of law. Eric and Peggy have also asserted counterclaims against Tucker on their

behalf and on behalf of PET LLC for alleged breaches of Tucker's obligations to the LLC.

Before the court are (1) a motion for summary judgment by Eric, Peggy, PET LLC, and

Cianchette Family LLC seeking dismissal of all of the claims asserted in the complaint filed by

plaintiffs Tucker and CBF Associates LLC, (2) a motion for summary judgment by Tucker seeking

---

[1] The Cianchettes will subsequently be referred to by their first names in this order.

dismissal of all of the counterclaims asserted by Eric, Peggy, and PET LLC, (3) two motions to strike filed by defendants, and (4) two motions to strike filed by plaintiffs.

The court will first address the various motions to strike.


Defendants' Motions to Strike

Defendants are seeking to strike Tucker's November 13, 2017 affidavit and Sean Rankin's November 10, 2017 affidavit, both submitted in opposition to defendants' motion for summary judgment.

Motions to strike are not permitted in connection with summary judgment. *See* M.R.Civ.P. 56(i). By its terms the rule applies to motions seeking to strike assertions, denials or qualifications in Rule 56(h) statements. In the court's view this rule should not be circumvented by instead moving to strike underlying affidavits. The court will, however, review defendants' arguments in determining whether and to what extent the court can consider the contents of Tucker's November 13, 2017 affidavit and Sean Rankin's November 10 affidavit in connection with the pending motions for summary judgment.[2]

With respect to defendants' objections to the Rankin affidavit, some of the statements objected to are hearsay or appear to lack foundation but are nevertheless admissible not for the truth but for Rankin's state of mind and as a basis for Rankin's statements that Androscoggin Savings Bank was willing to finance Tucker's purchase because various financing contingencies

---

[2] Defendants argue that the jurats of Tucker's November 13 affidavit and Rankin's affidavit do not distinguish between statements on information and belief and statements based on personal knowledge. While the court agrees that defendants are entitled to raise foundation and hearsay objections – some of which the court agrees are valid – it rejects defendants' objections based on the wording of the jurats. If the court were to rely on the language of jurats, four of the affidavits submitted by defendants (Eric's October 20 and November 13 affidavits and Peggy's October 23 and November 13 affidavits) suffer from the same infirmities. Indeed, the jurats of those four affidavits would be entitled to even less weight because they nowhere state that the affidavits in question are based on personal knowledge.

2

had either been met or had been waived by the Bank. The court will, however, disregard Rankin's assertion as to the state of Eric and Peggy's knowledge and his assertions that Eric and Peggy seemed unwilling to close and that the sellers' counsel was unresponsive prior to the closing. The Rankin affidavit does not provide any foundation for those statements.[3]

With respect to defendants' objections to Tucker's November 13 affidavit, the court agrees that some of his statements lack foundation or appear to be based on hearsay. However, to the extent that his statements are based on written communications that are annexed to his affidavit, the court understands that there is an agreement between the parties that all the written communications are admissible and the court will therefore consider the written communications even if Tucker's knowledge of some of those communications may be second-hand. For purposes of summary judgment, the court will disregard Tucker's statements as to his belief that Eric and Peggy never intended to sell and only rehired him as a subterfuge because those statements represent inferences on his part. However, based on the other evidence offered by plaintiffs, the court concludes that there is sufficient evidence from which a trier of fact could draw those inferences. *See, e.g.,* Plaintiffs' November 13, 2017 Statement of Additional Material Facts submitted in opposition to defendants' motion for summary judgment ¶¶ 235-36, citing Peggy Deposition at 234-35.

Plaintiffs' Motion to Strike

Plaintiffs are seeking to strike the November 20, 2017 affidavit of George Marcus and a "Statement of Additional Undisputed Material Facts" appended to defendants' Reply Statement of Material Facts.

---

[3] Plaintiffs have, however, offered other evidence that Eric and Peggy's counsel was unresponsive. *See* Plaintiffs' November 13, 2017 SMF ¶ 28.

3

With respect to plaintiffs' motion to strike the affidavit of George Marcus, the principle that parties should not be able to circumvent Rule 56(i) by moving to strike an underlying affidavit is equally applicable. As with defendant's motion to strike, however, the court will nevertheless review plaintiffs' arguments in determining whether and to what extent it can consider assertions in the Marcus affidavit.

The problem with the Marcus affidavit is that the court understands that the parties had agreed that Marcus would not be a witness at the trial and accordingly there is a serious question whether defendants are entitled to rely on his affidavit as admissible evidence at the summary judgment stage. Plaintiffs are entitled to raise this issue.[4]

There is, however, no dispute that the emails and other communications attached to the Marcus affidavit are admissible according to the parties' agreement. At least two of those are already in the summary judgment record. Exhibits S and V to Tucker's November 13, 2017 affidavit. As far as the court can tell, the only additional information in the Marcus affidavit consists of assertions with respect to telephone calls with counsel for Tucker on December 29, 2015, January 26, 2016, and January 28, 2016 and a voicemail message left for Tucker's counsel on January 27, 2016. The telephone call to Tucker's counsel on January 26 is referred to in Exhibit M to Tucker's November 13, 2017 affidavit, the content of the January 28 telephone call is set forth in Marcus Exhibit C, and the January 27 voicemail is referred to in Exhibit S to Tucker's November 13, 2017 affidavit. The court will therefore consider the Marcus exhibits and will disregard the remaining assertions in the Marcus affidavit.[5]

---

[4] The court also agrees that the tone of defendants' opposition to plaintiffs' motion to strike the Marcus affidavit and the adjectives used (e.g., "disingenuous" and "scurrilous") are entirely uncalled for.

[5] Those assertions are not material to the outcome of defendants' motion for summary judgment.

4

Plaintiffs' motion to strike the statement of additional material facts appended to defendants' reply statement is granted. Rule 56(h)(2) provides that a party *opposing* summary judgment may submit a statement of additional material facts that the opponent contends raise disputed issues for trial. Rule 56 nowhere authorizes a *moving* party to submit additional material facts after opposition papers have been filed and the party opposing summary judgment no longer has any further opportunity to respond.

## Summary Judgment

Summary judgment should be granted if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. In considering a motion for summary judgment, the court is required to consider only the portions of the record referred to and the material facts set forth in the parties' Rule 56(h) statements. *E.g., Mahar v. StoneWood Transport*, 2003 ME 63 ¶ 8, 823 A.2d 540. The facts must be considered in the light most favorable to the non-moving party. *Id.* Thus, for purposes of summary judgment, any factual disputes must be resolved against the movant. Nevertheless, when the facts offered by a party in opposition to summary judgment would not, if offered at trial, be sufficient to withstand a motion for judgment as a matter of law, summary judgment should be granted. *Rodrigue v. Rodrigue*, 1997 ME 99 ¶ 8, 694 A.2d 924.

## The Underlying Agreements

Central to the claims in this action are two agreements. The first is the PET LLC Agreement, appended as Exhibit A to the complaint. That agreement was formed between Peggy, Eric, and Tucker (PET stands for "Peggy Eric Tucker") as the vehicle for their purchase of the

5

Casco Bay Ford car dealership in 2013. Eric owned a 34% interest in PET LLC, and Peggy and Tucker each owned a 33% interest. Peggy was the designated Manager of the LLC.

The second agreement is a November 16, 2015 purchase and sale agreement for the sale of Eric and Peggy's membership interests in PET LLC to Tucker. This agreement (the "Membership P&S") is appended to the complaint as Exhibit B. If consummated, it would have transferred sole ownership of the Casco Bay Ford dealership to Tucker.

The November 16, 2015 Membership P&S required Tucker to make a $150,000 non-refundable deposit by November 18, 2015 and provided in section 2.5 that the closing "shall take place on January 31, 2016." Section 2.5 further provided as follows

> Notwithstanding the foregoing, provided that the Buyer has pursued completion of the contingencies contained in section 6(a) and further provided that the satisfaction of such contingencies are reasonably in progress, Buyer shall have the right to extend the Closing Date for not more than thirty (30) days by giving written notice of such extension to Sellers prior to the initial Closing Date, provided that the purchase price shall increase by $1,000 for each calendar day the Closing does not occur after January 31, 2016.

Section 4.5 of the Membership P&S provided that Tucker would furnish certain details of the financing for the purchase to Eric and Peggy and further stated:

> If Sellers, in their sole discretion, are not satisfied that the Buyer has sufficient funding to close on this transaction, the Sellers may terminate this contract without penalty by providing Buyer with written notice of termination on or prior to December 15, 2015.

On December 15, 2015 – the deadline set forth in section 4.5 above – Eric, Peggy, and Tucker executed an agreement titled "Purchase and Sale Contingency Agreement" that extended Eric and Peggy's right to terminate the contract pursuant to section 4.5 to January 15, 2016. A copy of the

6

Purchase and Sale Contingency Agreement is annexed to Tucker's November 13, 2017 affidavit as Exhibit G.[6]

Article 6 of the November 16, 2015 Membership P&S set forth certain contingencies applicable to the obligations of both Tucker as the Buyer and Eric and Peggy as the Sellers. Among other things, it provided:

> Sellers' obligations under this Agreement are contingent upon Buyer having obtained from Ford Credit the release of any personal guarantees . . . given by either of the Sellers in regard to Casco Bay Ford's floor plan financing facilities and any other personal guarantees which either Seller has given in regard to PET or Casco Bay Ford to any person, including but not limited to vendors, Ford Motor Company, governmental entities, and other credit providers.

Membership P&S section 6.2. Another provision of the agreement, section 6.3, provided that the obligations of both Buyer and Seller were contingent upon the closing of a separate agreement by which the car dealership real estate, separately owned by Cianchette Family LLC,[7] would be purchased by Tucker or his assignee. The Real Estate Purchase and Sale agreement, dated November 17, 2015 and executed by Tucker and by Eric as Manager of Cianchette Family LLC, is annexed to the complaint as Exhibit C. It also called for a closing by January 31, 2016. Tucker assigned the real estate contract to CBF Associates LLC.

Plaintiffs' Claims for Breach of the November 16, 2015 Membership P&S Agreement and November 17 Real Estate Purchase Agreement

Tucker claims that defendants breached the November 16 Membership P&S Agreement and the November 17 Real Estate purchase and sale agreement by failing to close even though

---

[6] Exhibits to Tucker's November 13, 2017 affidavit will subsequently be referred to in the following form: "Tucker Ex. ___."

[7] Eric is the manager of Cianchette Family LLC. The other member is the trustee of the First Cianchette Family Trust, of which the beneficiaries are Eric and Peggy's children excluding Tucker.

7

Tucker had met or was prepared to meet all of the purchase conditions. These claims are the subject of counts I and IV of the complaint.

Defendants' motion for summary judgment on these claims is based on the contention that Eric and Peggy had a right to terminate the agreement under sections 4.5 and 6.2 as set forth in a January 28 letter from their counsel stating that Eric and Peggy were exercising their right to terminate "effective immediately." Tucker Ex. V.

Section 4.5

The first issue with respect to defendants' right to terminate under section 4.5 is whether that right had been extended beyond January 15 (the deadline as extended under the December 15, 2015 Purchase and Sale Contingency Agreement referred to above). On that issue the undisputed facts demonstrate that in exchange for not exercising their right to terminate at that time, defendants' counsel sent a proposed Amendment to the Purchase and Sale Contingency Agreement extending the deadline to February 15, which was signed by Tucker and which Tucker's counsel treated as binding on Eric and Peggy as well as on Tucker. *See* Tucker Ex. H; Marcus Ex. D (asking for confirmation that upon receipt of the extension Eric and Peggy would not invoke section 4.5).

Although it appears that Eric and Peggy never signed Exhibit H, the court concludes that under the circumstances it is undisputed that Tucker knew that Eric and Peggy were not merely making a proposal but were making a binding offer which, once accepted, was sufficient to modify the deadline under section 4.5. *See, e.g., RDP Technologies Inc. v. Cambi AS*, 800 F.Supp. 2d 127, 141 (D.D.C. 2011). This is true notwithstanding the existence of a separate provision in the Membership P&S that no modifications of the agreement may be made except in a writing signed

8

by both parties. *See Granger Northern Inc. v. Cianchette,* 572 A.2d 136, 139 (Me. 1990) (contract provision permitting only changes in writing may itself be subsequently modified by the parties).

Accordingly, as of January 28 Eric and Peggy still had the right to terminate under section 4.5. In addition, the court interprets the language of section 4.5 ("If Sellers, in their sole discretion, are not satisfied that the Buyer has sufficient funding . . .") as allowing Eric and Peggy to terminate based on a subjective belief that Tucker's financing was inadequate. If at all possible, contract language should be interpreted to provide that the standard in determining whether a condition has been satisfied is that of an objectively reasonable person. Restatement 2d of Contracts § 228; *Pearce Associates LLC v. Perry,* 2008 ME 181 ¶ 17, 960 A.2d 1166. In this instance, however, the court is constrained to find that the unambiguous language provides Eric and Peggy with a right to terminate based on a subjective belief that Tucker's financing was inadequate.[8]

However, there is still a disputed issue for trial on Eric and Peggy's right to terminate under section 4.5. Although they were entitled to terminate based on a subjective belief that the financing was inadequate, there is a strong argument that they were required to exercise that clause in good faith. *See* Restatement 2d of Contracts § 228 cmt. a. Even though Maine does not generally recognize an implied duty of good faith in contract cases, none of the relevant decisions have turned on contractual provisions that allowed one party to exercise certain rights based on a subjective belief. *See, e.g., Camden National Bank v. Crest Construction Inc.,* 2008 ME 113 ¶ 18, 952 A.2d 213; *Haines v. Great Northern Paper Inc.,* 2002 ME 157 ¶ 15, 808 A.2d 1246.[9]

---

[8] Plaintiffs do not argue that the "sole discretion" language is ambiguous, nor have they offered parol evidence that would generate a disputed issue of fact as to whether the parties intended that an objective standard be used. *Compare Guntert v. City of Stockton,* 43 Cal.App.3d 203, 211, 213 (1974).

[9] The contract at issue in *Haines* contained a provision allowing Great Northern, in its sole judgment, to limit the number of users of its forest lands to 1993 levels. 2002 ME 157 ¶ 2. However, that provision was not the source of the dispute.

9

In *Diversified Foods Inc. v. First National Bank,* 605 A.2d 609, 612-14 (Me. 1992), the Law Court concluded that a provision allowing the defendant banks to determine the inventory eligible for financing in their "sole discretion" did not require *objective* good faith. Under the UCC, subjective good faith was required, but there was no evidence that the banks had not acted for valid business reasons. 605 A.2d at 614. In *First NH Banks Granite State v. Scarborough,* 615 A.2d 248, 250-51 (Me. 1992), the Court noted that it had not extended the UCC's requirement of "objective good faith" beyond its statutory scope but it appeared to consider the issue of subjective good faith in noting that there was no evidence in the case that the Bank had acted "without honesty in fact."

Where a contract provision grants one party a discretionary right to terminate for a specified reason, therefore, it follows that the right to terminate based on a subjective belief must be exercised in good faith.[10] Moreover, in other contexts Maine law recognizes that discretion can be abused and that where discretion has been granted, it must be exercised in good faith. *E.g., Gay v. Gay's Supermarkets, Inc.,* 343 A.2d 577, 580 (Me. 1975); *Wight v. Mason,* 134 Me. 52, 59, 180 A. 917, 920 (1935).

Even bypassing whether a subjective good faith requirement is implicit in section 4.5, that section gave Eric and Peggy the right to terminate if they were "not satisfied that the Buyer has sufficient funding." They did not have the unilateral right to terminate for other reasons. Allowing Eric and Peggy to terminate even if they did not believe Tucker's funding was inadequate would rewrite the contract by converting section 4.5 into a right to terminate at any time for any reason. As a result, if Eric and Peggy terminated not because they were dissatisfied as to the sufficiency of Tucker's financing but for another reason entirely, they would not have been entitled to invoke

---

[10] This is consistent with case law requiring that "termination for convenience" clauses be invoked in good faith. *See Krygoski Construction Co. v. United States,* 94 F.3d 1537, 1540-41 (Fed. Cir. 1996).

10

section 4.5. In part, this ties back into the issue of good faith – because evidence that Eric and Peggy did not have a good faith belief that Tucker's financing was inadequate would support an inference that they improperly decided to terminate for other reasons.

In this case, there is evidence which, construed in Tucker's favor, would allow a jury to find that termination was not based on concern about financing. The day before the termination notice was sent, counsel for Eric and Peggy informed Tucker's counsel that termination would be invoked unless Tucker agreed to amend the purchase and sale agreement in various respects. Tucker Exhibit S. The subsequent notice of termination (Tucker Ex. V) specifically references Tucker's unwillingness to accept those amendments, rather than concern about financing, as precipitating the termination notice.[11] Moreover, in the negotiations toward a subsequent agreement after the failure of the November 16, 2015 Membership P&S, there is evidence that Eric and Peggy focused exclusively on obtaining further releases and did not raise any concerns with respect to financing. *See* Tucker Ex. Y.

Tucker has also offered evidence sufficient to create a disputed issue of fact on his claim that Eric and Peggy never intended to sell their membership interests and were just leading Tucker on, eventually using section 4.5 as an excuse to cancel. This follows both from certain deposition testimony, *see* Plaintiffs' November 13, 2017 SAMF ¶¶ 235-36, and from the entire series of events, which, construed in the light most favorable to Tucker, could be found to support an inference that Eric and Peggy never planned to sell and were using the proposed sale as a method to divest Tucker of his 33% interest in PET LLC.

---

[11]     In this context, it is also relevant that while the January 28 termination notice referred to both sections 4.5 and 6.2, it did not specifically mention financing but instead referred "among other things, and without limitation, [to] the failure to obtain personal releases from Ford."

Finally, there is also evidence that Eric and Peggy did not have any basis for a good faith belief that Tucker's financing was inadequate. The summary judgment record contains evidence that prior to the termination notice, counsel for Eric and Peggy was provided with information that the SBA had approved a guarantee of Androscoggin Bank's loan to Tucker and that financing was in place. *E.g.,* Plaintiffs' SAMF ¶¶ 93, 124, 125, 128, 136. Knowledge of counsel may be imputed to the client. *Orlandella v. O'Brien,* 637 A.2d 105, 106 n.1 (Me. 1994). This is certainly true when the lawyer who had received the information with respect to financing is also the lawyer who communicated the January 28 termination notice.

As far as the court can tell, the only arguably pertinent information that was not communicated to Eric and Peggy or their counsel was that Androscoggin Bank was prepared to proceed without any subordination agreement from Ford. However, considering the facts in the light most favorable to Tucker, a jury could find that Eric and Peggy's reliance on that issue is an after-the–fact attempt to justify a termination made for other reasons, given evidence that they never attempted to make any inquiry whether the subordination issue actually presented a financing problem. Plaintiffs' November 13, 2017 SAMF ¶ 142.

Absence of Necessary Releases

As noted above, section 6.2 of the Membership P&S made the sale contingent on obtaining the release of personal guarantees given by Eric or Peggy to Ford Credit with respect to Casco Bay Ford floor plan facilities and any other personal guarantees given by Eric or Peggy to any other entity in connection with Casco Bay Ford. It appears to be undisputed that Eric had given a personal guarantee to Ford Credit with respect to Casco Bay Ford's floor plan facility, and the

12

summary judgment record contains evidence that a draft release from Ford Credit was provided to defendants in December 2015. Plaintiffs' November 13, 2017 SAMF ¶ 156.

The draft release from Ford Credit was only a release as to any future obligations that might arise from the date of the closing, not a release of obligations that might have existed prior thereto. *See* Defendants' October 23, 2017 SMF ¶ 23, citing Talia Ex. 5. In contrast, section 6.2 of the Membership P&S called for the release of "*any* personal guarantees given . . . in regard to Casco Bay Ford's floor plan financing facilities" (emphasis added). The court interprets that language as calling for a complete release. However, there is evidence that prior to the closing neither Eric nor Peggy nor their counsel ever raised that issue or suggested that the draft Ford Credit release provided in December was inadequate. Plaintiffs' November 13, 2017 SAMF ¶¶ 161-62

On January 27, 2016 counsel for Eric and Peggy informed counsel for Tucker that Eric and Peggy were prepared to terminate unless Tucker agreed to certain amendments, one of which involved releases "from Ford and Androscoggin." Tucker Exhibit S. The request for a release from Androscoggin was new. Whether the request for a release from "Ford" was intended to mean Ford Credit is uncertain. Counsel for Tucker appears to have understood that reference to mean Ford Motor Co. instead of Ford Credit, and counsel for Eric and Peggy did not disabuse him of that understanding. *See* Tucker Exs. T, V. There is no evidence that either Seller had given any personal guarantees to Ford Motor Co., and therefore it does not appear that a release from Ford Motor Co. was required under section 6.2 of the Membership P&S.

The only specific basis given in Eric and Peggy's January 28 notice of termination (Tucker Ex. V) was the failure to obtain personal releases from "Ford" – again creating uncertainty as to whether Eric and Peggy were relying on something that was not a condition of the purchase and sale agreement.

13

Regardless of what was stated in the notice of termination, Eric and Peggy now rely on Tucker's failure to obtain a complete release from Ford Credit. Although they are correct that the required release had not been obtained as of January 28, they are not entitled to summary judgment on that basis. This is because – contrary to the apparent assumption in the January 28 notice of termination – they had no contractual right to terminate the contract before closing based on inadequacy of releases. Only section 4.5 allowed Eric and Peggy to exercise a right of termination – if based in good faith on concerns about Tucker's financing – at any point before the closing. Section 6.2, including the requirement of a complete release from Ford Credit, was a contingency which had to be satisfied at the closing, but it did not provide for a right of early termination.

The non-occurrence of a contract condition or contingency may discharge obligations under a contract but only "when the condition can no longer occur." Restatement 2d of Contracts § 225(2). In this case it appears that a satisfactory Ford Credit release could not have been obtained by the January 31 closing deadline. However, Tucker had the right to extend that deadline by 30 days under section 2.5 – a provision that expressly referenced obtaining releases under section 6.2. Tucker contends that he would have exercised his right to extend the closing deadline if he had been advised that the Ford Credit release was not satisfactory. Plaintiffs' November 13, 2017 SAMF ¶ 108.

There is evidence that a satisfactory Ford Credit release was later obtained. *Id.* ¶¶ 169-70. While there may be disputed issues of fact as to whether that release could have been obtained within the 30-day extension period, *but see* Tucker Ex. Y (suggesting that Ford Credit would need approximately four weeks to process a complete release of Eric's personal guarantee), the facts construed in the light most favorable to Tucker leave open the possibility that the section 6.2 contingency could have been satisfied.

Accordingly, there are disputed issues of fact which preclude summary judgment for defendants on counts I and IV of the complaint based on either section 4.5 or section 6.2 of the Membership P&S.

Plaintiffs' Claims for Breach of Subsequent Contract for the Sale of the Dealership

As noted above, after the sale contemplated by the November 16, 2015 Membership P&S fell through, Tucker alleges that the parries reached a subsequent agreement for his purchase of the Casco Bay Ford dealership and associated real estate and that Eric and Peggy breached that deal as well. These claims are the subject of counts II and V of the complaint.

Although they deny that a subsequent agreement was ever reached, Eric and Peggy apparently acknowledge that there are disputed issues of fact on that issue. They have, however, moved for summary judgment with respect to Tucker's subsequent agreement claim because they contend that that claim is barred pursuant to the Statute of Frauds. Specifically, Eric and Peggy contend that since the sale of the dealership was contingent on the sale of the underlying real estate[12] and since a contract for the sale of real estate has to be memorialized in a writing to be enforceable, Tucker cannot enforce a subsequent purchase agreement even if it were found that one had been reached.

Maine's statute of frauds, 31 M.R.S § 514, provides in relevant part as follows:

> [N]o action shall be maintained . . . upon any contract for the sale of lands . . . unless the promise, contract or agreement on which such action is brought, or some memorandum or note thereof, is in writing and signed by the party to be charged therewith, or by some person thereto lawfully authorized; but the consideration thereof need not be expressed therein, and may be proved otherwise.

---

[12] *See* Membership P&S section 6.3.

In this case Tucker has offered evidence that after the original purchase of the dealership failed to close because of Eric and Peggy's January 28 notice to terminate the contract, there was a subsequent meeting between Tucker and Peggy at which agreement was reached to reinstate the purchase and sale contract with a closing date to be scheduled around the end of April subject to several new conditions – that an adequate release from Ford Credit be obtained, that a new release from Androscoggin Bank be obtained, and that Tucker return to work at Casco Bay Ford on March 14, 2016.[13] *See* Plaintiffs' SAMF ¶¶ 187-92.

Tucker has also offered evidence that the subsequent agreement – reinstating the original purchase and sale agreement with a new closing date and the additional conditions – is reflected in several emails annexed to his affidavit as Exhibits Y-AA. Emails may constitute writings sufficient to satisfy the statute of frauds. *McClare v. Rocha*, 2014 ME 4 ¶¶ 1, 11, 12, 86 A.3d 22. Moreover, if the essential elements of an agreement are set forth in writing, the remaining details or particulars need not be. So long as one or more writings identify the parties to the contract, the real estate in question, and in some cases the purchase price, the statute of frauds is satisfied even if there remains a dispute over whether an agreement was ultimately reached. *See McClare,* 2014 ME 4 ¶¶ 18- 19.

In this case the essential elements are set forth in the original purchase and sale contracts which Tucker contends were revived by the subsequent March agreement, as allegedly reflected in Tucker Exhibits Y-AA. Defendants, however, point out that the real estate in question had to be conveyed by Cianchette Family LLC (of which Eric was the Manager), and none of the emails subsequent to the failure of the original purchase and sale agreement were signed by Eric.

---

[13] There is evidence that Tucker had been fired from Casco Bay Ford on February 4 but defendants informed him later that day that the firing was revoked and that he was instead placed on administrative leave. Tucker Ex. X.

16

At the outset, it would appear that Eric's signature on the original real estate purchase and sale agreement would alone be sufficient to satisfy the Statute of Frauds because, according to Tucker, that same agreement was reinstated with a later closing date subject to certain additional conditions. However, even if a signed writing by Eric subsequent to the failure of the original deal would otherwise be required, defendants are not entitled to summary judgment based on the statute of frauds.

Specifically, an email authored by Peggy on March 11, 2016 reads in pertinent part as follows:

> Spoke with dad. Here is what he has agreed to.
>
> We will close on Ford's designated month end as long as the releases are in place.
>
> . . . .
>
> You will return to work Monday and we will get a new p&s drawn up.
>
> . . . .
>
> Dad wants a decision today with a commitment to be at work by Monday at the latest.
>
> Let me know …………. thanks

Tucker Ex. Y. Tucker contends that this constituted an offer which he accepted at a meeting on March 13.

Whether a writing is sufficient under the statute of frauds is ordinarily an issue of law. *Brown Development Corp. v. Hemond,* 2008 ME 146 ¶ 12, 956 A.2d 104. In this case, if Eric had signed Tucker Ex. Y, the court would conclude that Tucker Ex. Y, plus the original purchase and sale documents and the other March emails, would satisfy the statute of frauds. Based on the language of Tucker Ex. Y ("Spoke with Dad. Here is what he has agreed to"), there is at least a

17

factual issue whether Eric had authorized Peggy to convey the offer or proposal in question. If so, while there apparently remain disputed issues as to whether a subsequent agreement was ultimately reached, the statute of frauds would not bar Tucker's claim that a subsequent contract was agreed and that it too was breached.

Alternatively, even if Exhibit Y and the other March emails allegedly reviving the purchase and sale agreement were not sufficient to satisfy the statute of frauds, Tucker has still generated a factual dispute for trial on his subsequent agreement claim. This is because Tucker has offered evidence that a significant condition of the alleged subsequent agreement was that he return to work at Casco Bay Ford – allegedly because there was no General Manager to replace him and because he was needed as the "Ford Fii" designee under the dealership's agreement with Ford Motor Co. – which Tucker contends brings this case within the "part performance" exception to the statute of frauds.

Under the part performance doctrine, the transfer of the Casco Bay dealership real estate may be enforced – even without a sufficient writing – if Tucker proves by clear and convincing evidence that an oral contract existed, that Tucker acted in partial performance of his contractual obligations under the oral contract, and that Eric made misrepresentations that induced Tucker's partial performance. *Sullivan v. Porter,* 2004 ME 134 ¶¶ 11, 17, 861 A.2d 625. In this connection Tucker contends that he provided partial performance by complying with the condition that he return to work at the dealership and that defendants misrepresented their willingness to revive the purchase and sale agreement solely in order to persuade him to return to work until they could find a General Manager to replace him. Whether or not Tucker can provide the necessary proof

18

to prevail at trial,[14] he has offered sufficient evidence to generate a disputed issue for trial with respect to partial performance.

Plaintiffs' Claims for Specific Performance

Count III of Tucker's complaint seeks the equitable remedy of specific performance of the November 16, 2015 Membership purchase and sale agreement and the accompanying real estate purchase agreement. Count VI of the complaint seeks specific performance of the subsequent agreement allegedly reached in March 2016 to sell the dealership and associated real estate. Defendants' primary argument is that Tucker and CBF Associates will not prevail on either of their breach of contract claims, but they also contend that because Tucker is seeking money damages on those claims and has designated expert testimony as to damages, specific performance is not available.

In this case, part of the contract that plaintiffs are trying to enforce concerns the sale of real estate, which is typically enforceable through specific performance. However, the court understands that plaintiffs are primarily pursuing their claim for breach of contract in counts I, II, IV, and V by seeking damages for the loss of a commercial opportunity rather than because of the uniqueness of the real estate involved.

In any event, one of the elements of a claim for specific performance is a showing that no adequate remedy at law is available. *E.g., McIntyre v. Plummer,* 375 A.2d 1083, 1084 (Me. 1977). If plaintiffs are seeking money damages, they are necessarily not arguing that they do not have an adequate remedy at law.[15] A plaintiff may be entitled in its complaint to seek damages and

___

[14] *Sullivan v. Porter* states that "meaningful" partial performance, as well as inducement of that performance through misrepresentation, must be proven by clear and convincing evidence at trial. 2004 ME 134 ¶ 17.

[15] To obtain relief in the form of specific performance, plaintiffs would presumably have to pay the specified purchase price and meet the other conditions of the purchase and sale agreement.

specific performance in the alternative, but discovery has now closed in this case. Plaintiffs have not argued in their motion for summary judgment that they are dropping their claims for monetary relief in counts I, II, IV, and V. They are not entitled to seek monetary damages at trial and switch to a request for specific performance if they are unsatisfied with the monetary damages awarded.

Accordingly, the court agrees with defendants that plaintiffs cannot proceed at trial on both a damage claim and a specific performance claim and further agrees that plaintiffs, by continuing to pursue money damages, have already functionally acknowledged that they have an adequate remedy at law.

Accordingly, the court grants defendants' motion for summary judgment dismissing counts III and VI of the complaint.

Tucker's Claim of Fraud in the Inducement

In count VII of his complaint Tucker alleges that Eric and Peggy never intended to go through with a sale of the Casco Bay Ford dealership and associated real estate, that they fraudulently misrepresented their intent to sell him the dealership, and that he justifiably relied on those misrepresentations. Although the complaint characterizes this as a claim of "fraud in the inducement," Tucker is not seeking to avoid any contractual obligations but is instead bringing a cause of action for tortious misrepresentation seeking money damages for the financial losses that Tucker suffered in reliance on the alleged misrepresentations.[16]

---

[16] Unless Tucker also prevails on his claims that defendants breached the original or subsequently revived agreement to sell him the dealership and associated real estate, it appears that the financial losses that Tucker could recover if he prevails on count VII would be limited to the non-refundable deposit and the financial expenses (attorneys' fees, financing costs, and the like) that he incurred in unsuccessfully pursuing the acquisition of Casco Bay Ford.

Although the summary judgment record also contains contrary evidence, Tucker has offered sufficient evidence to demonstrate the existence of a disputed issue for trial in support of his fraudulent misrepresentation claim. Defendants, however, argue that a claim of fraudulent misrepresentation cannot be based on promises of future action even if there is no intent to perform, citing a line of Law Court cases ending with *Shine v. Dodge,* 130 Me. 440, 443, 157 A. 318, 319 (1931).

Since *Shine v. Dodge* was decided in 1931, section 530(1) of the Restatement 2d of Torts, published in 1977, promulgated a contrary principle: "A representation of the maker's own intention to do or not to do a particular thing is fraudulent if he does not have that intention." Moreover, although not overruling *Shine,* the Law Court has issued two subsequent decisions that have upheld fraudulent misrepresentation claims based on promises of future performance. *Boivin v. Jones & Vining Inc.,* 578 A.2d 187, 188-89 (Me. 1990); *Wildes v. Pens Unlimited Co.,* 389 A.2d 837, 840-41 (Me. 1978). This court has previously concluded that the proposition in *Shine* upon which defendants rely is no longer good law, *Bernier v. Hanson,* 2008 Me. Super. LEXIS 184 (Superior Court, Cumberland County, order issued Sept. 3, 2008), and will adhere to that ruling under the circumstances presented in this case. The same conclusion was reached by the U.S. District Court in *Veilleux v. National Broadcasting Co.,* 8 F.Supp.2d 23, 32-33 (D.Me. 1998) (Brody, J.).

Accordingly, defendants' motion for summary judgment on count VII is denied.

Securities Fraud Claims

In count VIII of Tucker's complaint, he alleges that Eric and Peggy's membership interests in PET LLC were securities as defined by Maine's law relating to the purchase and sale of

21

securities, 32 M.R.S. § 16102(28), and that Eric and Peggy's allegedly false representations form the basis for a claim to recover damages under 32 M.R.S. §§ 16501 and 16509(2). These statutes are also at issue with respect to Eric and Peggy's counterclaims against Tucker, which allege that he engaged in unlawful conduct in connection with the purchase of a security and assert liability under 32 M.R.S. § 16509(3).

Eric and Peggy point out that section 16509(2) provides that a person is liable to the purchaser "if the person *sells* a security" (emphasis added) by means of an untrue statement of a material fact. They argue that they did not sell their membership interests to Tucker and that Tucker's primary claim is based on their failure to sell. Accordingly, they argue that there can be no liability under § 16509(2).

Similarly, in response to Eric and Peggy's counterclaim, Tucker points out that section 16509(3) provides that a person is liable to the seller "if the person *buys* a security" (emphasis added) by means of an untrue statement of a material fact. Tucker argues that he did not buy Eric and Peggy's membership interests because they would not sell and he therefore cannot be held liable under §§ 16509(3).

In order to distinguish why he can go forward with his securities claim but Eric and Peggy cannot, Tucker relies on the definition of a "sale" in § 16012(26) which defines "sale" as including a "contract of sale." Since a contract of sale was reached, even though never consummated, Tucker argues that the putative sellers may be held liable.

The solution to this issue is found in the remedies that are statutorily available to purchasers and sellers under § 16509. If a violation is found, purchasers may recover (1) the consideration paid for the security, less the amount of income received on the security, upon tender of the security to the seller or (2) if the purchaser no longer has the security, actual damages consisting

22

of the amount a purchaser would have received by tendering the security less the value received when the purchaser disposed of the security. § 16509(2)(A) and (2)(C). Sellers may recover (1) the security and any income received on the security after the sale, upon tender of the purchase price or (2) damages equaling the difference between the price of the security when sold and the value the security would have had in the absence of the purchaser's untrue statements of material fact. § 16509(3)(A) and (3)(C). In each case purchasers and sellers would be also entitled to recover interest, costs, and reasonable attorney's fees.

All of the purchaser's remedies and all of the seller's remedies are premised on a purchase and sale having taken place.[17] Accordingly, Eric and Peggy are entitled to summary judgment on Tucker's securities fraud claim, and Tucker is entitled to summary judgment on Eric and Peggy's securities fraud counterclaim.

## Tucker's Claims Against Eric and Peggy involving the Management of PET LLC

Tucker has asserted a claim against Eric and Peggy based on alleged violations of the PET LLC Agreement (Count IX) and a claim against Peggy for breach of fiduciary duty based on alleged violations of her duties as the Manager of PET LLC (Count X).

With respect to count IX, Eric and Peggy argue that Tucker, as a Member of the LLC, does not have any right to bring a direct action against Eric and Peggy because the recovery he seeks would belong to the LLC rather than to Tucker and can only be sought through a derivative action. With respect to count X, Peggy argues that she is immunized because Tucker's fiduciary duty

---

[17] It can be argued that Tucker has paid consideration – in the form of his non-refundable deposit of $150,000 – for securities he has been unable to purchase and that he is therefore entitled to seek recovery of that consideration under § 16509(2)(A). However, consideration is recoverable under § 16509(2)(A) upon tender of the securities, and no tender is possible here because no sale took place.

23

claims merge with his contract claims for breach of the LLC Agreement and the latter can only be brought as derivative claims.

Derivative vs. Direct Claims

Eric and Peggy rely on 31 M.R.S. §§ 1631 and 1632, which provide that a direct action can only be brought with proof of an injury that is not solely the result of an injury suffered by the LLC and that otherwise a member may bring a derivative action for injury to the company by following the procedures set forth in 31 M.R.S. §§ 1632-36.

The court concludes, however, that PET LLC constitutes a "closely held limited liability company" within the meaning of 31 M.R.S. § 1637(1) and that Tucker's claims that Eric and Peggy have breached the LLC Agreement therefore fall within 31 M.R.S. §§ 1637(2) and 1637(3).

Those provisions provide as follows:

> **2. Limitation on derivative actions.** Except to the extent ordered by the court in an action under subsection 3, paragraph A, sections 1632 to 1636 do not apply to a closely held limited liability company.
>
> **3. Exception to limitation on derivative actions.** If justice requires:
>      **A.** A derivative action commenced by a member of a closely held limited liability company may be treated by a court as a direct action brought by the member for the member's own benefit; and
>      **B.** Recovery in a direct or derivative action by a member of a closely held limited liability company may be paid directly to the plaintiff or to the closely held limited liability company if necessary to protect the interests of creditors and of other members.

Thus, in the case of a closely held LLC, § 1637(2) dispenses with all of the prerequisites for a derivative action set forth in §§ 1632-36 unless those are specifically ordered by the court. Moreover, under § 1637(3)(A) a derivative action may be treated as a direct action "if justice requires." In determining whether justice requires such treatment, courts have considered whether

24

the claims involve oppressive action by majority shareholders against the interests of minority shareholders or alleged breaches of fiduciary duty owed to minority shareholders. *See, e.g.,* 2 O'Neal and Thompson's Close Corporations and LLCs § 9:26 (3d ed.) at n.35 (reviewing cases which, taken together, "represent judicial acceptance of what may be termed an individual cause of action for oppression of minority shareholders"); *id.* § 9:49; *Banyan Investment Co. LLC v. Evans,* 2012 Utah App. 333 ¶¶ 3, 18-19, 292 P.3d 698; *Schumacher v. Schumacher,* 469 N.W.2d 793, 797-99 (N.D. 1991).

In *Beaudry v. Harding,* 2014 ME 126 ¶ 5, 104 A.3d 134, the Law Court stated that a member of an administratively dissolved LLC may not bring a direct action when the harm alleged was not personal to him. *Beaudry,* however, is distinguishable because that case did not involve any claim that there had been oppressive conduct or breaches of fiduciary duty by majority members. The plaintiff in *Beaudry* was instead attempting to sue a lawyer who had previously represented the LLC for professional negligence. 2014 ME 126 ¶ 3. The Law Court in *Beaudry* had no reason to consider the applicability of 31 M.R.S. § 1637(3).

In this case, Tucker has offered evidence that Peggy as Manager made a $375,000 interest–free loan to Cianchette Family LLC, the entity whose members are Eric and the Cianchette Family Trust (a trust whose beneficiaries exclude Tucker) – even though section 5.1.3 of the LLC Agreement expressly denied Peggy authority to make loans exceeding $50,000. Moreover, section 5.4.3 of the LLC agreement specifies that dealings between the LLC and members or their affiliates shall be "at arm's length and on commercially reasonable terms." Tucker has also offered evidence that Peggy increased the monthly rent paid by the Casco Bay Ford dealership to Cianchette Family LLC from the $23,000 set forth in the lease to $65,000 and that she directed those payments to be made to an entity called Top of Exchange LLC, another entity owned by Eric and the Cianchette

25

Family Trust that excludes Tucker. It is undisputed that Top of Exchange has no ownership interest in the Ford dealership real estate and is not owed any money by PET LLC.

If proven, the actions challenged by Tucker would appear to constitute the oppression of a minority shareholder by the two majority shareholders and would constitute breaches of the LLC Agreement and cognizable claims against Peggy for breach of fiduciary duty. As a result, a direct action under 31 M.R.S. § 1637(3) is appropriate in this case.

One of the reasons to allow direct actions in cases of this kind is that any recovery in a derivative action would accrue to the corporation and thus be under the control of the same majority shareholders who have been named as defendants and whose oppressive conduct is being challenged by the minority shareholder. *See Dowling v. Narragansett Capital Corp.,* 735 F.Supp. 1105, 1113-14 (D. R.I. 1990) (allowing recovery to accrue to the control of those who committed wrongdoing would produce "absurd result"). Indeed, Eric and Peggy argue in this case that Tucker has not been injured because if PET had retained the money Peggy loaned interest-free to Cianchette Family LLC and if Peggy had not paid allegedly exorbitant rent to another Cianchette entity, Peggy would still have the right to determine whether any of that money would have been distributed to Tucker or credited to him. Defendant's Motion for Partial Summary Judgment dated October 23, 2017 at 24 n.4. Contrary to defendants' arguments, this *supports* Tucker's argument that he should be entitled to bring a direct action.

31 M.R.S. § 1637(3)(B) expressly contemplates that recovery in a direct action may be paid directly to the plaintiff. In addition, if a jury finds Eric and/or Peggy liable on Tucker's claims with respect to the management of PET LLC, section 9.3 of the LLC Agreement permits the court to fashion appropriate equitable relief if there is any reason why awarding a monetary recovery to Tucker would be inappropriate. Although Tucker has not sought any recovery from PET LLC, he

26

has named PET LLC as a defendant, and PET will be retained as a defendant to the extent that its presence may be necessary to award complete relief.

It bears emphasis that 31 M.R.S. § 1637(3) essentially tracks § 7.01(d) of the American Law Institute's 1994 Principles of Corporate Governance. ALI Comment (e) to § 7.01 suggests that direct actions by shareholders in closely held LLCs may be allowed if they will not (1) unfairly expose the corporation or the defendants to multiple actions, (2) prejudice the interests of creditors of the corporation, or (3) prejudice the rights of other shareholders. There are only three members of PET LLC, and all are parties to this action. There is no possibility of multiple lawsuits, and there are no creditors or other shareholders whose rights may be prejudiced.

Accordingly, the court concludes that the claims made by Tucker in counts IX and X of the complaint are claims that may be treated as direct actions under 31 M.R.S. § 1637(3)(A). Defendants argue, based on the wording of § 1637(3)(A), that an action first has to be commenced as a derivative action before it can be treated as a direct action. The problem with that argument is that § 1637(2) dispenses with all the prerequisites of derivative actions in the case of closely-held LLCs and §1637(3)(B) allows direct recovery by members of closely-held LLCs. Under the circumstances, no purpose would be served by requiring Tucker to have first asserted a derivative claim.

Fiduciary Duty Claim vs. Peggy

As noted above, count X of Tucker's complaint asserts a claim that Peggy violated her fiduciary duty as Manager of PET LLC. 31 M.R.S. § 1559 (1) provides that, except as may be set forth in the LLC agreement, members of an LLC shall discharge their duties in good faith with a view to the interests of the LLC and the members and with the care and skill or an ordinarily

27

prudent person. However, 31 M.R.S. §§ 1521(3)(A) and (B) expressly provide that the duties of a member – including any fiduciary duties – may be restricted or eliminated by the provisions of the limited liability agreement, "except that the implied contractual covenant of good faith and fair dealing [established in 31 M.R.S. § 1522(2)] may not be eliminated." § 1521(3)(A).

The PET LLC Agreement provides that as Manager, Peggy

> shall not be liable, responsible, or accountable in damages or otherwise to the Company or to any Member for any action taken or any failure to act on behalf of the Company within the scope of the authority conferred on the [Manager] by this Agreement or by law, unless the action was taken or omission was made fraudulently or in bad faith or unless the action or omission constituted gross negligence.

PET LLC Agreement § 5.4.1.

Accordingly, while section 5.4.1 limits Peggy's liability to instances of fraud, bad faith, or gross negligence, she is not entirely immunized by the LLC Agreement.[18] Moreover, while Peggy argues that the provisions of the LLC Agreement convert Tucker's fiduciary duty claims into contract claims and that Tucker's fiduciary duty claims are redundant in view of his contract claims, the court disagrees. *See RJ Associates Inc. v. Health Payors' Organization Limited Partnership HPA, Inc.,* 1999 Del. Ch. LEXIS 161 at *34 (Del. Ct. of Chancery 1999); *Maillet v. FrontPoint Partners LLC,* 2003 U.S. Dist. LEXIS 9832 at *9-*10 (S.D.N.Y. 2003). Although there is overlap between Tucker's contractual claims in count IX and his fiduciary duty claims in count X, he is entitled to proceed on both theories.

---

[18] Moreover, to the extent that Tucker alleges that Peggy acted outside the scope of her authority by making a loan in excess of $50,000, section 5.4.1 may not apply.

28

Tucker's Punitive Damage Claim

While Tucker has brought a separate count of his complaint for punitive damages, punitive damages are not a stand-alone cause of action but are a remedy that may be awarded as part of the damages for a tort claim if a defendant is found liable on such a claim and plaintiff additionally proves the prerequisites for punitive damages by clear and convincing evidence. Without expressing any opinion as to whether Tucker will be able to offer sufficient evidence at trial to allow his punitive damage claim to go to the jury, *see St. Francis de Sales Federal Credit Union v. Sun Insurance Co.,* 2002 ME 127 ¶ 2, 818 A.2d 995, there are a sufficient number of factual disputes with respect to Tucker's tort claims at this point that summary judgment cannot be granted on the claim for punitive damages.

Defendants' Counterclaims against Tucker for Breach of Fiduciary Duty

Count I of defendants' counterclaims, brought on behalf of Eric and Peggy, alleges that Tucker violated his fiduciary duty to the other members of PET LLC by manipulating the financial affairs of the LLC, taking unauthorized money from the LLC, taking various actions at the Casco Bay Ford dealership that amounted to self-dealing, providing confidential information to competitors, and usurping corporate opportunities.[19] Defendants' claim that Tucker usurped a corporate opportunity is also the subject of count III of the defendants' counterclaims, and their claim that Tucker disclosed confidential information is the subject of count V of defendants' counterclaims.

---

[19] Notably, these claims are brought as a direct, rather than a derivative, action against Tucker by Eric and Peggy, which appears to be inconsistent with defendants' arguments that counts IX and X of Tucker's complaint could only have been brought as a derivative action.

29

Tucker seeks summary judgment on count I based on 31 M.R.S. § 1559(3), which provides in relevant part that unless otherwise provided in the LLC agreement

> a member not involved in the management of a limited liability company does not have a fiduciary duty to the limited liability company, or to any other member . . . solely by reason of being a member.

Nothing in the PET LLC Agreement imposes any fiduciary duty upon a member not involved in management.

Under the agreement, moreover, Peggy as Manager has "full, *exclusive*, and complete discretion, power and authority . . . to manage, control, administer, and operate the business of and affairs of the Company for the purposes herein stated, and to make all decisions affecting such business and affairs . . . ." PET LLC Agreement § 5.1.2 (emphasis added). Section 5.4.1.1 further provides, "No member is an agent of the Company solely by virtue of being a Member, and no Member has authority to act for the Company solely by virtue of being a member." In both these provisions, the "Company" is defined as PET LLC, not Casco Bay Ford. PET LLC Agreement § 1 (definitions).

Accordingly, the LLC Agreement excluded Tucker from involvement in the management of PET LLC. Based on section 1559(3) and the provisions of the PET LLC Agreement, therefore, Tucker did not owe any fiduciary duty to either PET LLC or its members.

Eric and Peggy argue that although Tucker was not involved in the management of the LLC, he was the general manager of the Casco Bay Ford dealership and was very much involved in the management of the dealership. In that capacity, however, Tucker was acting as an employee of the dealership or of the LLC, not as a member of the LLC. Whatever wrongdoing may be committed by employees, they are not subject to a fiduciary duty to their employers, at least absent

evidence that a relationship of trust and confidence existed between employer and employee and that there was a great disparity of position and influence favoring the employee.[20]

Tucker's alleged failings at the dealership may be relevant to the course of dealing between the parties – specifically to the events of March 2016, when Eric and Peggy declined to go forward with what Tucker alleges was a second agreement to sell their membership interests and when Tucker either was fired or resigned from his employment at Casco Bay Ford. However, Tucker is entitled to summary judgment on Eric and Peggy's counterclaim for breach of fiduciary duty.

PET LLC Counterclaim for Usurpation of Corporate Opportunity

Count III of Defendants' counterclaims, brought on behalf of PET LLC, alleges that Tucker usurped a corporate opportunity belonging to PET LLC by going into business as a majority owner of a Chevrolet dealership in Waldoboro ("Tucker Chevy").[21] The first question on this issue is whether a duty to bring a corporate opportunity to the attention of PET LLC can be imposed upon Tucker if he did not have a fiduciary duty to PET LLC for the reasons stated earlier.

In the leading Maine case on usurpation of a corporate opportunity, the Law Court emphasized that the obligation to bring business opportunities to the attention of the corporation was derived from the fiduciary duty owed to a corporation by corporate officers and directors. *Northeast Harbor Golf Club v. Harris,* 661 A.2d 1146, 1148-49 (Me. 1995) (outlining the principle

---

[20] In this case there is no evidence of any disparity of position and influence favoring Tucker.

[21] Defendants previously argued that certain other alleged misconduct by Tucker constituted the usurpation of corporate opportunity, *see* Plaintiff's October 20, 2017 SMF ¶46, but they do not reiterate those arguments in opposition to Tucker's motion for summary judgment. In addition, their other allegations do not fall within any recognizable definition of usurpation of a corporate opportunity. In opposing summary judgment, defendants also do not contend that Tucker's subsequent employment as General Manager at a Ford dealership in Brunswick (now known as "Tucker Ford" even though Tucker is apparently not an owner) constituted the usurpation of a corporate opportunity. *See* Defendants' Opposition to Tucker's Motion for Summary Judgment dated November 13, 2017 at 11 n.3.

31

that "corporate fiduciaries owe a duty of loyalty to their corporations"). *See id.* at 1150 ("a corporate fiduciary should not serve both corporate and personal interests at the same time"). In this case, for the reasons stated earlier, Tucker did not owe a fiduciary duty pursuant to the LLC statute and the PET LLC Agreement.

Moreover, the PET LLC Agreement also expressly provides in pertinent part:

> [N]othing in this Agreement shall be deemed to restrict in any way the rights of any Member . . . to conduct any other business or activity whatsoever, *and no Member shall be accountable to the Company or to any other Member with respect to that business or activity even if the business or activity competes with the Company's business.*

PET LLC Agreement § 5.4.2 (emphasis added).

Given that Tucker did not owe a fiduciary duty to PET LLC or to Eric and Peggy as a matter of law and that he was expressly immunized from being accountable to PET LLC based on the conduct of other businesses (even if those competed with PET LLC's business), the court cannot find that he may be held liable for usurpation of a corporate opportunity.

Defendants' Claim for Disassociation

Count IV of defendants' counterclaim seeks disassociation of Tucker from PET LLC pursuant to 31 M.R.S. § 1582(5). That section authorizes the equitable remedy of judicial expulsion of a person from membership in an LLC if the person

> **A.** Has engaged or is engaging in wrongful conduct that has adversely and materially affected, or will adversely and materially affect, the limited liability company's activities;
> **B.** Has willfully and persistently committed, or is willfully and persistently committing, a material breach of the limited liability company agreement or the person's duty or obligation under this chapter or under applicable law; or

**C.** Has engaged, or is engaging in conduct relating to the limited liability company's activities that makes it not reasonably practicable to carry on the activities with that person as a member.

Although Eric and Peggy argue that disassociation is warranted under all three categories in 31 M.R.S. § 1582(5), they have not offered evidence that Tucker has committed any material breach of the LLC Agreement, and the court has ruled above that defendants cannot prevail as a matter of law on a claim that Tucker breached a duty to the LLC. Tucker is therefore entitled to summary judgment to the extent that Eric and Peggy rely on section 1582(5)(B).

Similarly, the evidence in the summary judgment record establishes that it cannot be found under §1582(5)(C) that it is "not reasonably practicable" to carry on the activities of the LLC so long as Tucker is a member. *See* Plaintiffs' October 20, 2017 SMF in support of motion for summary judgment at ¶¶ 80-83, 85-86 (admitted) and Peggy Dep. 344, cited in both ¶ 84 of Plaintiffs' October 20, 2017 SMF and ¶ 84 of Defendants' November 13, 2017 opposition SMF. Although they assert that Tucker's continued presence in the LLC prevents them from carrying on the business, defendants have not demonstrated that there is a factual dispute for trial on this issue.

However, even if Tucker cannot be found liable for breach of fiduciary or usurpation of corporate opportunity on this record, there are disputed issues of fact as to alleged misconduct by Tucker. The court cannot rule out the possibility this could be found after trial to be "wrongful conduct that has adversely and materially affected, or will adversely and materially affect, the limited liability company's activities." 31 M.R.S. § 1582(5)(A).

Accordingly, Tucker's motion for summary judgment is denied with respect to Eric and Peggy's disassociation claim to the extent that claim is based on 31 M.R.S. § 1582(5)(A).

33

<u>PET LLC's Trade Secrets Claim</u>

The final counterclaim is brought by PET LLC against Tucker for alleged violations of the Uniform Trade Secrets Act, 10 M.R.S. §§ 1541-48. The trade secrets allegedly disclosed were Casco Bay Ford dealer financial statements provided to General Motors (apparently in connection with Tucker's involvement with the Chevrolet dealership in Waldoboro) and some other financial information (described as estimates of Casco Bay Ford advertising costs, charts created by Tucker to monitor his performance at Casco Bay Ford, and an approximation of Casco Bay Ford's profits for 2015 and 2016). The latter documents were allegedly provided to Robert Esposito and Steve Goodrich, principals in other Ford dealerships who were affiliated with Tucker in connection with Tucker's proposed purchase of Casco Bay Ford.

The Uniform Trade Secrets Act allows recovery of "actual losses" and unjust enrichment resulting from misappropriation of trade secrets. 10 M.R.S. § 1544(1). In the context of this case, misappropriation is defined as "[d]isclosure or use of a trade secret without express of implied consent by a person who . . . [a]t the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was . . . [a]cquired under circumstances giving rise to a duty to maintain its secrecy or limit its use . . . ." 10 M.R.S. § 1542(2)(B)(2)(ii).

"Trade Secret" is defined as follows:

> "Trade Secret" means information, including, but not limited to, a formula, pattern, compilation, program, device, method, technique or process, that:
> **A.** Derives independent economic value, actual or potential, from not being generally known to and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use; and
> **B.** Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

10 M.R.S. § 1542(4).

34

Tucker's summary judgment motion focuses on the second part of the definition of a trade secret — whether the dealer financial statements have been the subject of reasonable efforts to maintain their secrecy.[22] *See Spottiswoode v. Levine,* 1999 ME 79 ¶ 27 n.7, 730 A.2d 166. On this issue Tucker argues that PET LLC did nothing to mark dealer financial statements as confidential, that the PET LLC agreement says nothing about confidential information, that dealer financial information was provided to some persons who were not employees or managers of PET LLC or Casco Bay Ford, and that dealer financial statements were at some point kept in an unlocked file cabinet in the Casco Bay Ford showroom. Plaintiffs' October 20, 2017 SMF ¶¶ 91-95, 101, 103, 116-21.

Defendants respond that dealer financial statements were also kept in a locked attic and file cabinet. Defendants' November 13, 2017 Opposition SMF ¶¶ 107-08, 111-12. Intermittent or occasional locking is not enough to generate a factual dispute as to whether reasonable security efforts were made. Defendants also contend that employees at Casco Bay Ford including Tucker had signed a policy to maintain the confidentiality of "customer information." *Id.* ¶¶ 105-06. However, defendants have not made the policy in question part of the summary judgment record and "customer information" is not at issue in this lawsuit.

Defendants further refer to a statement in an email by Tucker that he would not want certain information he sent to Esposito and Goodrich in April 2016 to become public. *Id.* ¶ 102. However, defendants have acknowledged that they do not know what that information consists of, which

---

[22] Although not placed in issue by the pending summary judgment motion, it could be difficult for PET LLC to prove that the dealer financial statements derive independent economic value within the meaning of the first part of the "trade secret" definition. The archetypal trade secrets are proprietary formulas, processes, or devices which have intrinsic value. Although proprietors of closely-held companies understandably consider their financial statements to be confidential information that they do not want released to competitors (as exemplified by protective orders entered in this case), it is far from clear that those statements have independent economic value or that any actual economic loss can be proven to result from their disclosure. *See* 10 M.R.S. §§ 1542(4)(A), 1544(1).

makes its status as a trade secret too speculative. *Id.* ¶ 90. Defendants finally rely on Peggy's characterization of a document which she says was authored by Tucker that prohibited disclosure of confidential material, trade secrets, or proprietary information outside the company. *Id.* ¶ 106. The document in question, however, has not been submitted as part of the summary judgment record, and Peggy's characterization of the document is hearsay that is not admissible for purposes of summary judgment. Rule 56(e) expressly requires that sworn or certified copies of documents referred to in an affidavit be attached to the affidavit.

The court concludes that on this issue defendants have not offered evidence that, if produced at trial, would be sufficient to resist a motion for judgment as a matter of law as to whether PET LLC took reasonable efforts to maintain the confidentiality of the alleged trade secrets. As a result, Tucker is entitled to summary judgment on PET's trade secrets claim for damages. This does not necessarily mean that defendants cannot raise arguments with respect to the appropriateness of Tucker's alleged disclosure of confidential or proprietary information as part of their allegations of misconduct on Tucker's part.

The entry shall be:

1. Defendants' motions to strike the affidavit of Sean Rankin and the November 13, 2017 affidavit of Tucker Cianchette are denied but, as stated above, the court has reviewed the arguments made in those motions in determining whether and to what extent it can consider assertions in those affidavits.

2. Plaintiff's motion to strike the affidavit of George Marcus is denied but, as stated above, the court will consider the exhibits to that affidavit and will disregard statements unrelated to the appended documents.

3. Plaintiffs' motion to strike the "Statement of Additional Undisputed Material Facts" appended to defendants' reply statement of material facts is granted.

4. Defendants' motion for partial summary judgment is denied as with respect to counts I, II, IV, V, VII, IX, and X of plaintiffs' complaint.

5. Defendants' motion for summary judgment dismissing counts III, VI, and VIII of the complaint is granted.

6. Plaintiffs' claim for punitive damages (count XI) is not a free-standing cause of action. However, plaintiffs' punitive damage claim remains in the case at this time as a potential remedy for plaintiffs' tort claims.

7. Defendant Tucker Cianchette's motion for partial summary judgment dismissing counts I-III and V of defendants' counterclaim is granted.

8. Defendant Tucker Cianchette's motion for partial summary judgment dismissing count IV of defendants' counterclaim is denied.

9. The Clerk is directed to incorporate this order in the docket by reference pursuant to Rule 79(a).

Dated: January 12, 2018

Thomas D. Warren
Justice, Superior Court

*Cianchette, et al. v. Cianchette*, et al. PORSC-CV-16-249

Attorneys for Plaintiffs:

Timothy Norton, Esq.
Graydon Stevens, Esq.
Jennifer Archer, Esq.
Kelly Remmel & Zimmerman
PO Box 597
Portland, ME  04112-0597

Attorneys for Defendants:

Lee Bals, Esq.
Jennie Clegg, Esq.
George Marcus, Esq.
David Johnson, Esq.
Marcus Clegg & Mistretta
One Canal Plaza Suite 600
Portland, ME  04101-4035